584 A.2d 301

**Mark J. PIEPER, Appellant,**

**v.**

**AMETEK–THERMOX INSTRUMENTS DIVISION, and Workmen's Compensation Appeal Board, Appellees.**

Supreme Court of Pennsylvania.

Submitted March 9, 1990.

Decided Dec. 27, 1990.

26

Louis C. Alvin, Pittsburgh, for appellant.

Lawrence J. Baldasare, Pietragallo, Bosick and Gordon, Daniel D. Harshman, for Ametek–Thermox Instruments Div.

Norman R. Haigh, Secretary, W.C.A.B., Harrisburg, for appellees.

Before NIX, C.J., and LARSEN, FLAHERTY, McDERMOTT, ZAPPALA, PAPADAKOS and CAPPY, JJ.

## OPINION

CAPPY, Justice.

The question before us is whether the Commonwealth Court committed an error of law by requiring Appellant to establish a "causal connection" between his prior work-related injury and his present disability in order to qualify for reinstatement of compensation pursuant to The Pennsylvania Workmen's Compensation Act.[1] Because the record evidence fails to establish a termination of the liability of Appellant's employer we find that Appellant was only required, as he did, to establish that his disability "continued". We therefore reverse the decision of the Commonwealth Court.

### History

This is an Appeal by Mark J. Pieper from an order of the Commonwealth Court reversing an order of the Workmen's Compensation Appeal Board ("Board") affirming a Referee's reinstatement of benefits to Pieper. On October 8, 1982, Pieper suffered a lower back injury during the course of his employment with Ametek–Thermox Instruments Division ("Ametek"). As a result of that injury, and pursuant to a notice of compensation dated December 6, 1982, Pieper was paid temporary total disability benefits for a "Herniated Disk L4 L5" until April 11, 1983, at which time he returned to work and executed a "final receipt".[2] On April

1. 77 P.S. § 1 et seq., 1915, June 2, P.L. 736, art. 1, § 101 et seq., as amended.

2. Pursuant to 77 P.S. § 1001, "[a] final receipt, given by an employe or dependent entitled to compensation under a compensation agreement notice or award, shall be prima facie evidence of the termination of the employer's liability to pay compensation under such agreement notice or award: Provided, however, that a referee designated by the department may, at any time within three years from the date to which payments have been made, set aside a final receipt, upon

22, 1983, Pieper suffered a recurrence of his injury and benefits were reinstated by "supplemental agreement".[3] On May 31, 1983, Pieper returned to work on a part-time basis and he received partial disability benefits until they were terminated by a supplemental agreement dated June 21, 1983,[4] which resulted from his return to full-time employment on June 20, 1983. Two days later, on June 23, 1983, Pieper was laid off, and commencing August 26, 1983, he received *unemployment compensation* for twenty-six weeks.[5]

Prior to being laid off on June 23, 1983, Ametek had returned Pieper to his same job despite his inability to perform the required lifting of heavy objects, prolonged bending, stretching, reaching, and climbing of ladders. When Pieper was laid off he was still experiencing pain in his lower back and in his leg, and he continued to wear a back brace. On September 18, 1984, Pieper filed a petition for reinstatement of benefits with the Board alleging a change in his condition as of January 25, 1984.

The Referee found that Pieper was "totally and permanently disabled from doing his former job as a mechanical assembler or any similar types of work" and that Pieper's "total disability since March 9, 1984, [was] the result of the work-related injury of October [8], 1982." Thereafter, the Referee reinstated Pieper's compensation benefits as of March 9, 1984, subject to a credit for periods Pieper worked

petition filed with the department, or on the department's own motion, if it be shown that all disability due to the injury in fact had not terminated."

**3.** Pursuant to 77 P.S. § 731, "[o]n or after the seventh day after any injury shall have occurred, the employer or insurer and employe or his dependents may agree upon the compensation payable to the employe or his dependents under this act; ... All agreements made in accordance with the provisions of this section shall be on a form prescribed by the department, signed by all parties in interest, and a copy or copies thereof forwarded to the department as required by rules and regulations."

**4.** This supplemental agreement was not offered into evidence and is not otherwise a part of the record in this matter.

**5.** During this twenty six week period, Pieper received no workmen's compensation benefits.

as a part-time bartender. In addition, the Referee held Ametek liable for all related medical expenses and bills of cost.

Ametek appealed the determination of the Referee to the Board claiming that Pieper failed to present unequivocal medical testimony to demonstrate the causal relationship between the work-related injury and his present disability. The Board concluded that the factual findings of the Referee were supported by competent evidence based upon: (1) Pieper's testimony; (2) the extensive record of agreements by the employer to pay compensation subsequent to the original injury; (3) Pieper's back operation to improve the disability caused by the injury; and (4) the testimony of Pieper's treating physician. While the Board recognized that the testimony of the physician focused upon the continuing nature of Pieper's disability rather than upon its causation, it nevertheless found that the evidence taken in its entirety was adequate to support the Referee's decision particularly where Ametek offered no medical evidence to contradict the causal relationship.

Ametek appealed the determination of the Board to the Commonwealth Court claiming: (1) Pieper failed to show a deterioration in his condition; (2) Pieper failed to show a *causal connection* between his work-related injury and his present disability; and (3) that the Referee and the Board erred in awarding total disability benefits to Pieper with only a credit to Ametek for part-time work performed by Pieper. The Commonwealth Court reversed the order of the Board upon a determination that the necessary finding of causation was not supported by substantial evidence. We granted Pieper's Petition for Allowance of Appeal, and we now reverse the Commonwealth Court.

## DISCUSSION

Pursuant to 77 P.S. § 834, all findings of fact by any Referee or the Board shall be based upon sufficient competent evidence. On appeal, the standard of review of a Board order is limited to determining whether there has

been a constitutional violation, or an error of law, or a violation of Board procedure, and whether the necessary findings of fact are supported by substantial evidence. 2 Pa.C.S.A. § 704;[6] *Hoffman v. Com., Unemployment Board of Review,* 524 Pa. 470, 574 A.2d 57 (1990); *Farquhar v. Workmen's Compensation Appeal Board (Corning Glass Works),* 515 Pa. 315, 528 A.2d 580 (1987); *Odgers v. Unemployment Compensation Board of Review,* 514 Pa. 378, 525 A.2d 359 (1987); and *McGovern v. State Employees' Retirement Board,* 512 Pa. 377, 517 A.2d 523 (1986).

█ When a claimant petitions for the reinstatement of benefits pursuant to 77 P.S. § 772,[7] his burden is different depending upon whether benefits have been "terminated" or "suspended". *Venanzio v. Workmen's Compensation Appeal Board (Eastern Exp.),* 88 Pa.Commw. 204, 489 A.2d 284 (1985), *appeal denied* (Pa. September 30, 1985). A termination of benefits is supported by a finding that all

6. *Administrative Agency Law,* 2 Pa.C.S. § 704, 1978, April 28, P.L. 202, No. 53, § 5.

7. Section 772 is entitled: Modification, etc., of notice of compensation available, agreement or award on change in disability of injured person; exception as to eye injuries; and in pertinent part provides:

"A referee designated by the department may, at any time, modify, reinstate, suspend, or terminate a notice of compensation payable, an original or supplemental agreement or an award of the department or its referee, upon petition filed by either party with the department, upon proof that the disability of an injured employe has increased, decreased, recurred, or has temporarily or finally ceased, or that the status of any dependent has changed. Such modification, reinstatement, suspension, or termination shall be made as of the date upon which it is shown that the disability of the injured employe has increased, decreased, recurred, or has temporarily or finally ceased, or upon which it is shown that the status of any dependent has changed: Provided, That, except in the case of eye injuries, no notice of compensation payable, agreement or award shall be reviewed, or modified, or reinstated, unless a petition is filed with the department within three years after the date of the most recent payment of compensation made prior to the filing of such petition: ... And provided further, That where compensation has been suspended because the employe's earnings are equal to or in excess of his wages prior to the injury that payments under the agreement or award may be resumed at any time during the period for which compensation for partial disability is payable, unless it be shown that the loss in earnings does not result from the disability due to the injury."

disability related to a compensable injury has ceased. *Central Pennsylvania Community Action, Inc. v. Workmen's Compensation Appeal Board (Probeck)*, 103 Pa.Commw. 278, 520 A.2d 112 (1987); *Unity Builders, Inc. v. Workmen's Compensation Appeal Board (Ellisor)*, 50 Pa. Commw. 527, 413 A.2d 40 (1980). Since the employee has recovered from his disability, the employer is no longer obligated to compensate the employee for that injury. However, a certain percentage of these claims are also settled for reasons practical and otherwise, which often results in a termination of the liability of an employer without an actual termination of the disability of the employee.

In any event, a termination of benefits must go hand-in-hand with a termination of the liability of an employer. If the claimant later petitions for reinstatement of benefits, it is incumbent upon the employer to submit the proper evidence of such termination (e.g. "final receipt" pursuant to 77 P.S. 1001 and/or "agreement" pursuant to 77 P.S. 732 or "formal award" pursuant to 77 P.S. 772). If the evidence submitted by the employer sufficiently establishes a "termination of liability", then the claimant must establish a causal connection between his current condition and the prior work-related injury in order to have benefits reinstated. *Russell v. Workmen's Compensation Appeal Board (Volkswagen of America)*, 121 Pa.Commw. 436, 550 A.2d 1364 (1988); *D.P. "Herk" Zimmerman, Jr. Inc. v. Workmen's Compensation Appeal Board (Himes)*, 103 Pa.Commw. 68, 519 A.2d 1077 (1987). To meet this burden, the claimant must establish that his disability has increased or recurred after the date of the prior award, and that his physical condition has actually changed in some manner. *Id.;* 77 P.S. § 772; *Memorial Osteopathic Hosp. v. Workmen's Compensation Appeal Board (Brandon)*, 77 Pa. Commw. 518, 466 A.2d 741 (1983); *Harris Weinstein/Clyde Shirt Co. v. Workmen's Compensation Appeal Board*, 65 Pa.Commw. 598, 443 A.2d 857 (1982).

No such causal connection must be shown in a "suspension of benefits" situation. A "suspension of benefits" is supported by a finding that the earning power of the claimant is no longer affected by his disability, whether it arises from his employer offering suitable replacement employment, or from the ability of the claimant to secure other suitable employment that provides equal or greater compensation. Should a claimant seek to have a suspension lifted, he is required to demonstrate only that the reasons for the suspension no longer exist. Simply, a claimant must show that while his disability has continued, his loss of earnings has recurred. *Certainteed Corporation and Aetna Casualty & Surety Company v. Workmen's Compensation Appeal Board (Williams)*, 126 Pa.Commw. 311, 559 A.2d 971 (1989), *appeal denied*, 524 Pa. 612, 569 A.2d 1370 (1989); *Baughman v. Workmen's Compensation Appeal Board (Laurel Environmental Services, Inc.)*, 121 Pa. Commw. 627, 550 A.2d 1051 (1988), *appeal denied* 577 A.2d 545 (1989); *Venanzio v. Workmen's Compensation Appeal Board (Eastern Exp.)*, 88 Pa.Commw. 204, 489 A.2d 284 (1985), *appeal denied* (1985); *Busche v. Workmen's Compensation appeal Board (Townsend and Bottum, Inc.)*, 77 Pa.Commw. 469, 466 A.2d 278 (1983), *appeal denied*, (1984).

In such suspension situations, the causal connection between the original work-related injury and the disability which gave rise to compensation is *presumed*. First, it is presumed because the causal connection between the original work-related injury and disability was initially either not contested by the employer or established by competent proof by the employee at the time of the original disability claim. Second, it is presumed because with a mere suspension of benefits, there is no contention by any party that the liability of the employer has terminated. The only fact established at a suspension of benefits is that the *earning power* of a claimant has improved to a point where benefits are no longer necessary. Since the disability continues to exist, the liability of the employer for the injury has not terminated. Therefore, in these situations the causal con-

nection between the original work-related injury and the disability goes unquestioned.

■ Thereafter, if the economic picture of a claimant changes and he applies for reinstatement of benefits, he need not re-prove the causal connection between the original disability and the fact that it was suffered at work per his original claim, since causation was established at the time of the original claim. However, since many months or years may pass before the economic condition of a claimant forces him to apply for reinstatement of benefits, the law requires a claimant to prove two things in order to show that the reasons for the suspension no longer exist. *Busche v. Workmen's Compensation appeal Board (Townsend and Bottum, Inc.)*, 77 Pa.Commw. 469, 466 A.2d 278 (1983), *appeal denied* (Pa. July 2, 1984), and its progeny.

■ First, he must prove that through no fault of his own [8] his earning power is once again adversely affected by his disability. And Second, that the disability which gave rise to his original claim, in fact, continues. *Id.* He need not re-prove that the disability resulted from a work-related injury during his original employment, since its cause has never been at issue. However, because of the passage of time, the law does require that he prove by a preponderance of the evidence that it is the same disability that the law presumes occurred during his original employment and for which he initially received workmen's compensation benefits. In otherwords, that his disability has not ceased during the passage of time.

**8.** We note that such a recurrence of a claimant's loss of earnings must be through no fault of his own. An employer may rebut claimant's proof of loss of earnings by establishing the availability of work that claimant is capable of performing. *Cerney v. Schrader & Seyfried, Inc.*, 463 Pa. 20, 342 A.2d 384 (1975); *Todloski v. Workmen's Compensation Appeal Board (Supermarket Service Corp.)*, 115 Pa.Commw. 138, 539 A.2d 517 (1988); *Smith v. Workmen's Compensation Appeal Board (Futura Industries)*, 80 Pa.Commw. 508, 471 A.2d 1304 (1984); *Busche v. Workmen's Compensation appeal Board (Townsend and Bottum, Inc.)*, 77 Pa.Commw. 469, 466 A.2d 278 (1983).

■ In the case *sub judice,* Pieper petitioned under 77 P.S. § 772, for reinstatement of benefits that were previously *terminated* alleging a change in his disability.[9] The Commonwealth Court therefore applied the standard applicable to "termination of benefits" situations as set forth in *D.P. "Herk" Zimmerman, Jr. Inc. v. Workmen's Compensation Appeal Board (Himes),* 103 Pa.Commw. 68, 519 A.2d 1077 (1987), and required Pieper to show that there was a causal connection between the prior work-related injury and his present disability.

However, Pieper's perhaps inartful use of the descriptive word "terminated" in his petition for reinstatement obviously does not, and cannot, supplant the necessity for a legal determination of whether Pieper's benefits were "terminated" rather than "suspended", and whether the liability of Ametek was or was not "terminated", as those terms of art are used, not in ordinary discourse, but under the applicable provisions of the Pennsylvania Workmen's Compensation Act.

Since the record evidence fails to establish a "termination" of the liability of Ametek, we conclude that the Commonwealth Court committed an error of law in applying the *Zimmerman* standard, which is applicable to such terminations. Accordingly, in the case *sub judice,* Pieper was only required to establish that his disability "continued" under *Busche v. Workmen's Compensation appeal Board (Townsend and Bottum, Inc.),* 77 Pa.Commw. 469, 466 A.2d 278 (1983), *appeal denied* (Pa. July 2, 1984), and its progeny.

In determining the standard of proof applicable to Pieper's situation, the Commonwealth Court stated:

9. In his petition for reinstatement of compensation Pieper merely checked "boxes" on a form, which completed a statement to the Referee that he had been a party to a notice of compensation payable from Ametek, and that he was petitioning to reinstate compensation thereunder that was "terminated" on June 21, 1983. There is no reference in this form to whether the liability of Ametek was terminated along with his benefits.

An injured employee who seeks reinstatement of benefits following a termination of them has the burden of proving that his physical condition has changed or deteriorated, *D.P. "Herk" Zimmerman, Jr. Inc. v. Workmen's Compensation Appeal Board (Himes)*, 103 Pa. Commonwealth Court 68, 519 A.2d 1077 (1987), and that there is a causal connection between the prior work-related injury and the current condition. *Id.* (No. 1423 C.D. 1987, op. at 4).

Had Claimant's benefits merely been suspended, as opposed to terminated, he would have needed only to show that his disability continued. *See, e.g., Venanzio v. Workmen's Compensation Appeal Board (Eastern Express)*, 88 Pa.Commonwealth Ct. 204, 489 A.2d 284 (1985). (No. 1423 C.D.1987, op. at 4, n. 1).

This determination by the Commonwealth Court that the "termination of benefits" standard was applicable was improperly based upon an assumption that a supplemental agreement dated June 21, 1983, terminated the "liability" of Ametek. We simply cannot and will not assume, as did the Commonwealth Court, that a supplemental agreement terminated the liability of the employer where a final receipt was not signed by the employee, where the controlling supplemental agreement was not submitted into evidence, and where there is evidence of record that Pieper's disability had not, in fact, terminated when the supplemental agreement was executed.

These circumstances, together with the increase in Pieper's earning power associated with his return to work prior to being laid off, reflect a suspension situation rather than one of termination. Therefore, Pieper was only required to establish that his disability has continued, and that his loss of earnings has recurred, under *Busche, supra*, and its progeny. Upon this determination, we must now decide whether Pieper sufficiently established such continuation of his disability and loss of earnings.

After a review of the record, we conclude that the testimony of Dr. Selker was sufficient to establish such continuation of Pieper's herniated disk suffered on October 8, 1982.

The relevant testimony of Dr. Selker is as follows:

Q. I want to go directly, Dr. Selker, to when you first examined Mark Pieper. Could you review your records and tell us what you found on that examination?

A. I saw Mark Pieper first 9 March 1984, at which time his history was one of having had two operations at the L-4,5 level and one at the L-5, S-1 level on the left. He had a record of three previous operations before I saw him.

I also understand from the history he did well after the first operation, but after the second and subsequent operations he did not do well. He had pain and he had a lot of discomfort in the leg.

On physical examination, he had palpable tenderness in the back at about the L-4,5 level, which caused radiation throughout the entire leg on the left. (R. 73a–74a)

.    .    .    .    .

He had sensory change over both the fifth route, which is 4–5, and the S–1 route, which is 5–1. (R. 75a)

.    .    .    .    .

Now, I have another letter to Stan Bushkoff [Dr. Bushkoff referred Pieper to Dr. Selker] dated 6 April 1984, about a month later. I told Stan that we admitted Mark Pieper to the hospital. We myelogramed him, as per our previous correspondence, and that the myelogram was positive at two levels, the L-5 level and the S-1 level on the left. And because I was going away and because we couldn't get him on the schedule at that point, we discharged him from the hospital. But I wrote to Stan and said, "I suspect he will yet need to have another exploration of this area. We will discharge him and readmit him at a later time for surgery.

Now, the myelogram and the CT were such at that point in my mind to indicate that this did not represent a

scar, that it represented disk disease, which I felt was remedial to a surgical approach. (R. 76a–77a)

. . . . .

On the Sixteenth of April [1984], after the operation, I wrote to Stan Bushkoff, said that I had operated on Mark Pieper at both 4–5 and 5–1. That the routes at both of these levels were involved at the foramen; in otherwords, the hole where the nerve root goes from the spinal cord out to go down to the leg, as well as recurrent disk disease at 4–5. (R. 77a)

. . . . .

The third of July, 1984, I wrote to Stan Bushkoff and said that Mark was seen in the office on 28 of June 1984 for his final visit. Had done quite well, except for point of soreness around the left sacroiliac joint. For all intents and purposes we discharged him from our service indicating to him if he had any additional problems we would be happy to see him and that's about it. (R. 79a)

. . . . .

Q. Have you seen Mark since the third of July and can you tell us from those records?

A. I did. I saw him 9/20/84 in the office. Returned having difficulty assuming different positions. He didn't have any leg pain. I was concerned about him going back to doing heavy work at that point in time.

I saw him again 11/15/84 where he was pretty much unchanged. He had some chronic muscle discomfort in the left lateral thigh, absent achilles reflex. Negative straight leg raising test. Had some discomfort approximately sixty degrees, which I didn't think much about. No motor weakness.

Advised him at that time to find some kind of non-physical, non-heavy lifting kind of job.

I saw him again on 2/21/85 when he had complaints of still having back and some aching in the leg if he did a lot of heavy lifting or any kind of activities that were strenuous. Again informed him I didn't think he could return to

the kind of work he was doing. I made a note. He obviously has had at both 4–5 and 5–1 with recurrence of disk material at each space. That was 2/21/85. I don't think I have seen Mark since.

Q. I am going to ask you an opinion, Dr. Selker, and I would like to confine your answers to those that you can state within a reasonable degree of medical certainty.

Are you able to give an opinion as to the medical condition which caused these medical problems that Mark Pieper has been experiencing?

A. Yes. He has had a herniated disk disease.

Q. A herniated disk disease from what area?

A. Both 4–5 and 5–1. Not only one occasion, but more than one occasion.

Q. Now, from 9 March [1984], when you first saw Mark Pieper, till the third of July, when you essentially released him, what physical limitations, as far as being able to work and so on, was he under?

A. He couldn't work in that interval at all. I would think for the most part, for somebody that's had four back operations, I wouldn't have thought he could do very much, except the normal activities of living during that time. (R. 79a–82a)

.     .     .     .     .

Q. As of February, 1985, what limitations was he under?

A. As of February of 1985, my feeling was he would have a chronic back problem ... (R. 84a)

From the testimony of Dr. Selker, it is clear to us that Pieper's back problem in the L4 L5 area changed numerous times since the original injury because of herniated disk disease in that region of his back, and that such herniated disk disease has continued. Ametek did not dispute the finding of fact by the Referee that the notice of compensation payable for the original injury describes the nature of the injury as "Herniated Disc L4 L5", which notice is also a part of the record herein. Furthermore, the sole contention

by Ametek regarding causation is that the testimony of Dr. Selker focuses on the continuing nature of Pieper's disability. Therefore, we hold that Pieper established by substantial evidence that his disability continued.

Upon this finding, pursuant to *Busche, supra,* Pieper was only required to establish that his earning power was once again affected by his disability. In that Pieper proved that he no longer received unemployment compensation, and since he was only able to maintain a part-time job as a bartender at a reduced income, he clearly met his burden of proof under *Busche, supra.* Accordingly, in the absence of any evidence that other employment was available to him,[10] Pieper was entitled to have the suspension lifted for that portion of his earning power that was once again affected by his disability.

Therefore, we reverse the decision of the Commonwealth Court, and we reinstate the decision of the Board, which correctly reinstated Pieper's benefits. However, since the Commonwealth Court did not reach the remaining issue raised by Ametek concerning whether the Referee and the Board erred in awarding total disability benefits to Pieper with only a credit to Ametek for part-time work performed by Pieper, we remand to the Commonwealth Court for consideration of that question.

Reversed and remanded.

LARSEN, McDERMOTT and PAPADAKOS, JJ., concur in the result.

10. *See* note 8, *supra.*