**EAT'N PARK RESTAURANTS, INC., Petitioner,**

v.

**WORKERS' COMPENSATION APPEAL BOARD (SKINNER–FORD), Respondent.**

Commonwealth Court of Pennsylvania.

Submitted on Briefs July 23, 1999.

Decided Sept. 7, 1999.

---

Harry W. Rosensteel, Pittsburgh, for petitioner.

Susan Paczak, Pittsburgh, for respondent.

Before McGINLEY, J., KELLEY, J., and MIRARCHI, Jr., Senior Judge.

McGINLEY, Judge.

Eat'N Park Restaurants, Inc. (Employer) petitions for review from the order of the Workers' Compensation Appeal Board (Board) that affirmed the decision of the Workers' Compensation Judge (WCJ) that granted the reinstatement petition of Roseanne Skinner Ford (Claimant), reversed the decision of the WCJ to suspend Claimant's benefits as of May 14, 1997, and remanded for a calculation of Claimant's entitlement to partial disability benefits.

Claimant sustained a work-related injury while in the course of her employment as a waitress for Employer on September 2, 1995, when she slipped on an unmarked wet floor and fell on her back and right hip. Pursuant to a notice of compensation payable, Claimant received compensation at the rate of $180.34 based on an average weekly wage of $200.36 for an "Acute lumbar/hip strain and left foot/ankle strain." Notice of Compensation Payable, Received by the Bureau of Workers' Compensation, October 11, 1995. On September 28, 1995, Claimant returned to work at a light duty position. Temporary total disability was reinstated pursuant to a Supplemental

Agreement dated October 6, 1995, as of September 29, 1995. On October 19, 1995, Claimant returned to work at wages lower than her pre-injury wage. On October 31, 1995, Claimant returned to work at her pre-injury position at no loss in earnings. Pursuant to a supplemental agreement dated November 6, 1995, Claimant received $41.71 from October 19–October 30, 1995, and her benefits were suspended as of October 31, 1995.

On September 27, 1996, Claimant sought medical attention for her injury and underwent a magnetic resonance imaging test (MRI). On October 4, 1996, Employer terminated her. On December 4, 1996, Claimant petitioned for reinstatement of benefits and alleged that she had been "restricted from work as of October 4, 1996, by panel doctors Brayer and Henderson." Claimant's Reinstatement Petition at 1; Reproduced Record (R.R.) at 155a. Employer denied that benefits were due and alleged that "Claimant was terminated for cause on October 4, 1996 and it is believed that her termination is the genesis of her petition." Employer's Answer at 1; R.R. at 157a.

The WCJ held hearings on January 16, 1997, March 20, 1997, July 7, 1997, and October 2, 1997. Claimant testified that her condition deteriorated between September 1995 and September 1996. Specifically, Claimant was unable to bend over to tie her shoes, took Darvocet and Tylenol

and used a heating pad at the end of the day. Notes of Testimony, January 16, 1997, (N.T.) at 8–10; R.R. at 8a–10a. Regarding her termination, Claimant stated that her boss, Paul Kurpakus (Kurpakus), general manager at Employer's store where Claimant worked, called her into his office on October 4, 1996, after he received a bill for Claimant's MRI. He was very upset because she didn't inform him that she was having the MRI and because she had another back problem. N.T. at 11; R.R. at 11a. That afternoon Kurpakus fired Claimant because she entered the wrong code into the computer when she punched in for work.[1] Claimant stated that she underwent back surgery on December 4, 1996. N.T. at 14; R.R. at 14a. On cross-examination, Claimant admitted that she had been counseled for going into the cash register without authorization and for giving food to someone without obtaining a receipt. N.T. at 22; R.R. at 22a. However, she testified that she operated the cash register without authorization because she arrived early for work and confronted a line of people. N.T. at 23–24; R.R. at 23a–24a. Claimant testified that she did not have any falls outside the workplace between her September 2, 1995, work injury and her termination. Notes of Testimony, October 2, 1997, (N.T., 10/2/97) at 7; R.R. at 92a. She testified that she punched in the wrong code because she needed reading glasses. N.T., 10/2/97 at 9;

---

1. Attorney Landay questioned Claimant concerning her dismissal:

Q: What happened later that same day on October the 4 th?
A: That afternoon I was scheduled to work until two o'clock. About one o'clock that afternoon, Paul [Kurpakus] asked me to see him after work, after I got off the floor. And he wanted to talk to me and he was very upset once again and I thought it was because of this MRI that he had received in the mail, but it wasn't.
Q: What did he talk to you about?
A: He fired me that afternoon.
Q: And why did he fire you? Why did he say he fired you?
A: He said he fired me because I messed up the computer.

. . . .
Q: Just tell us real briefly.
A: Okay. Our code for waitresses is 02— excuse me, 06. I had pushed 02, which is a cook's wage that I didn't realize that I had pushed it. And Mr. Kurpakus claimed that I was trying to cheat the company by claiming $5.35 instead of $2.35, which I had asked for help the day after that happened and he did not help me.

. . . .
Q: So he fired you the same day he received that MRI bill?
A: Yes, he did.
N.T. at 11–13; R.R. at 11a–13a.

R.R. at 93a. Claimant testified that she returned to work as a waitress at Denny's in May 1997, generally for thirty-three to thirty-seven hours per week at $2.61 per hour plus tips, which was increased to $2.83 per hour plus tips in September 1997. After a day of work at Denny's, Claimant testified that her back was very tired, and she soaked in Epsom salts, used a heating pad and elevated her feet. N.T., 10/2/97 at 9–11; R.R. at 94a–96a.

Janice Sahli (Sahli), also a waitress for Employer, testified that Karpakus was "very agitated and upset and disturbed" by what he received in the mail concerning Claimant on October 4, 1996. N.T., 10/2/97 at 18–19; R.R. at 103a–104a.

Claimant presented the deposition testimony of James H. Uselman, M.D. (Dr. Uselman), a board-certified neurosurgeon. Dr. Uselman began treating Claimant on October 17, 1996, when she was referred to him by Paul Brayer, M.D., Claimant's family physician. At that initial meeting, Dr. Uselman examined Claimant, took a history and reviewed an MRI. At that point, Dr. Uselman diagnosed Claimant with an L4–5 disk herniation which was giving her hip and thigh pain on the right side. Deposition of James H. Uselman, M.D., May 5, 1997, (Dr. Uselman Deposition) at 7; R.R. at 122a. On December 6, 1996, Dr. Uselman performed a right-sided L4–5 microscopic lumbar laminectomy and discectomy. Dr. Uselman related that immediately after the surgery Claimant had complete resolution of her leg pain but that Claimant fell down three steps shortly before Christmas in 1996 which resulted in increased back pain and pain in her right hip and thigh and "aggravated her postop convalescence." Dr. Uselman Deposition at 9–10; R.R. at 124a–125a. Dr. Uselman last saw Claimant on April 10, 1997, and reported that "she was pretty close to 100 percent, was ready to go back to work or at least return to full duty work at that point." Dr. Uselman Deposition at 11; R.R. at 126a.

Kim Beer (Beer), a waitress for Employer and former co-worker of Claimant, testified on behalf of Employer that Claimant never mentioned back problems as a result of her work-related injury prior to her termination. Notes of Testimony, March 20, 1997, (N.T., 3/20/97) at 10; R.R. at 45a. Beer testified that Claimant told her that she fell down some steps at home sometime in 1996 and showed her bruises from the fall. According to Beer, Claimant told her that she shouldn't be working but that she couldn't afford to miss work. N.T., 3/20/97, at 11; R.R. at 46a.

Kurpakus testified that he fired Claimant on October 4, 1996, after learning that she punched in the wrong department on two consecutive days which led to a higher hourly rate than she was entitled to receive. N.T., 3/20/97, at 18–19; R.R. at 53a–54a. Kurpakus testified that he decided to fire Claimant between 7 and 7:30 a.m. after getting clearance from his regional director. N.T., 3/20/97, at 20; R.R. at 55a. Kurpakus stated that the decision to fire Claimant was made before he received the bill for the MRI. N.T., 3/20/97, at 21; R.R. at 56a. Kurpakus recounted that he had previously given Claimant a verbal warning for using the cash register without permission on a day when there was a "significant" shortage in the register. Claimant received a written warning for serving tomato and cheese on a sandwich to another employee and not charging her for them. N.T., 3/20/97, at 23–23, 38; R.R. at 58a–59a, 73a.

Robert P. Durning, M.D. (Dr. Durning), a board-certified orthopedic surgeon, testified on Employer's behalf by deposition. Dr. Durning examined Claimant on February 26, 1997, took a history and reviewed her medical records. Dr. Durning diagnosed Claimant with low back and right leg pain which he attributed to the discectomy at L4–L5 performed by Dr. Uselman and mild residual right L5 nerve root dysfunction. Deposition of Robert P. Durning, M.D. September 26, 1997, (Dr. Durning Deposition) at 9. Dr. Durning testified

that if Claimant had fallen at home, that fall may have caused her disc herniation. Dr. Durning Deposition at 10. On cross-examination, Dr. Durning stated that the lack of doctor visits between the end of 1995 and September 1996 indicated to him that Claimant's work-related injury was not the cause for the surgery for a herniated disc, but he conceded that he could not definitely rule out that Claimant's September 2, 1995, injury was not the cause of her herniated disc because he did not view the films of the 1995 MRI. Dr. Durning Deposition at 16.

The WCJ reinstated Claimant's benefits as of October 4, 1996, ruled that Claimant was entitled to full compensation benefits from October 5, 1996, through May 13, 1997, and suspended Claimant's benefits as of May 14, 1997, the date she began work at Denny's. The WCJ made the following relevant findings of fact:

11.....a. It is found that the claimant is entitled to have compensation benefits reinstated as of October 4, 1996 at her rate of $180.34. In so finding, the testimony of the claimant is found to be credible with regard to her continued and worsening symptoms and pain. The testimony of Ms. Sahli is found credible.

b. The testimony of Dr. Uselman is found to be more credible than that of Dr. Durning that the claimant's worsening condition requiring surgery was caused by the work injury of September 2, 1995. It is noted Dr. Uselman was a treating physician and operated on the claimant on December 12, 1996.

c. The claimant is found credible with regard to the incidents surrounding her dismissal. The testimony of Mr. Kurpakus is found not credible. It is noted that the claimant had been employed by Eat N' Park for ten years as a waitress. Her supervisor agreed that she was a good waitress. It is noted that the claimant did not have any disciplinary actions against her prior to her work injury.

d. It is found that Mr. Kurpakus fired the claimant because of her work injury. It is noted that the claimant was fired the same day that the MRI bill was received by her employer for payment.

WCJ's Decision, February 11, 1998, Findings of Fact Nos. 11a–d at 6–7; R.R. at 143a–144a.

Claimant appealed to the Board and alleged that because Claimant was terminated due to her work-related injury and because she continued to suffer a loss in earnings after returning to work she should have received partial disability benefits, and her benefits should not have been suspended as of May 14, 1997.

Employer appealed to the Board and asserted that the WCJ erred when she concluded that Claimant met her burden of proof because Dr. Uselman's testimony was equivocal, that it was error to suspend Claimant's benefits when Dr. Uselman found her fit to return to full duty, and that it was error to award benefits when Claimant was fired for cause.

The Board affirmed the WCJ's reinstatement because it was supported by substantial evidence. The Board, however, reversed the WCJ's decision to suspend and remanded to the WCJ for a calculation of Claimant's entitlement to partial disability benefits. The Board reasoned:

We believe the Judge [WCJ] erred in suspending Claimant's benefits on May 14, 1997. *Harle* [*Harle v. Workmen's Compensation Appeal Board (Telegraph Press, Inc.)*, 540 Pa. 482, 658 A.2d 766 (1995) ] is distinguishable from this matter because in Harle, the claimant could not return to his pre-injury job because the employer no longer existed. In the matter before us, Claimant could not return to her pre-injury employment because she was fired due to her work-related injury. Once a claimant sustains his burden in the reinstatement, it becomes the defendant's burden to demonstrate that the claimant's disability is caused by something other than the

work related injury. Therefore, Claimant's benefits should continue.

Board Opinion, March 17, 1999, at 5–6; R.R. at 152a–153a.

Employer contends that the Board erred when it reversed the WCJ's suspension of Claimant's benefits where Dr. Uselman released her to full duty and she returned to her pre-injury job with another employer.[2]

Employer does not contest the reinstatement of Claimant's benefits during the period from October 5, 1996, through May 13, 1997, when she returned to work at Denny's. Employer contends that the Board misapplied *Harle v. Workmen's Compensation Appeal Board (Telegraph Press, Inc.)*, 540 Pa. 482, 658 A.2d 766 (1995). In *Harle*, our Pennsylvania Supreme Court suspended John Harle's (Harle) benefits after Harle returned to work at a lower paying but similar job in the same field after his employer had ceased operations. The Supreme Court reasoned that Harle's loss of earnings was not the result of his injury but was caused by economic factors unrelated to his injury. *Harle*, 540 Pa. at 487, 658 A.2d at 770. The Supreme Court reviewed Section 306(b) of the Workers' Compensation Act[3], 77 P.S. § 512, that governs benefits for partial disability and determined "an employee whose earning power is no longer affected by his work-related injury is no longer entitled to partial disability benefits, even though his earnings may not match his pre-injury earnings." *Harle*, 540 Pa. at 486, 658 A.2d at 769.

■ The relevant inquiry for this Court is whether Claimant's loss in earnings was the result of Claimant's work injury. *Hertz–Penske Truck Leasing Co. v. Workmen's Compensation Appeal Board (Bowers)*, 546 Pa. 257, 684 A.2d 547 (1996).

A 'suspension of benefits' is supported by a finding that the earning power of the claimant is no longer affected by his disability, whether it arises from his employer offering suitable replacement employment, or from the ability of the claimant to secure other suitable employment that provides equal or greater compensation.

*Pieper v. Ametek–Thermox Instruments Division*, 526 Pa. 25, 33, 584 A.2d 301, 304 (1990).

■ We agree with the Board that the present case is distinguishable from *Harle*. In *Harle*, Harle could not return to his time of injury job because his employer had ceased operations. He could not return to his job which he physically was capable of performing due to economic factors totally unrelated to his work injury. Here, The WCJ found Claimant could not return to her time of injury job because she was terminated because of her work injury. The WCJ, as the ultimate finder of fact in workers' compensation cases, has exclusive province over questions of credibility and evidentiary weight, and is free to accept or reject the testimony of any witness in whole or in part. *General Electric Co. v. Workmen's Compensation Appeal Board (Valsamaki)*, 140 Pa.Cmwlth. 461, 593 A.2d 921, *petition for allowance of appeal denied*, 529 Pa. 626, 600 A.2d 541 (1991).

■ Therefore, the reason that Claimant could not return to her time of injury job was that Employer fired her because of her work injury. Claimant, on her own, found suitable employment but her earnings were less than at her time of injury job. Under the conditions set forth in *Pieper*, Claimant's situation did not warrant a suspension because she neither returned to her time of injury job with Employer nor did she find a job that provided equal or greater compensation. Once the

---

**2.** Our review is limited to determining whether constitutional rights were violated, whether an error of law was committed or whether necessary findings of fact are supported by substantial evidence. *Vinglinsky v. Work-*

*men's Compensation Appeal Board (Penn Installation)*, 139 Pa.Cmwlth. 15, 589 A.2d 291 (1991).

**3.** Act of June 2, 1915, P.L. 736, *as amended.*

claimant sustains the burden for a reinstatement, the employer bears the burden of demonstrating that the claimant's disability is caused by something other than the work-related injury. *Magulick v. Workers' Compensation Appeal Board (Bethlehem Steel Corp.)*, 704 A.2d 176 (Pa. Cmwlth.1997). Employer here did not shoulder that burden. The WCJ found Claimant was forced into the lower paying job. The WCJ found Employer discharged her because of her work-related injury, not for cause.

Accordingly, we affirm.

*ORDER*

AND NOW, this 7th day of September, 1999, the order of the Workers' Compensation Appeal Board in the above-captioned matter is affirmed.