SAINT LUKE'S HOSPITAL, Petitioner,

v.

WORKERS' COMPENSATION
APPEAL BOARD (INGLE),
Respondent.

Commonwealth Court of Pennsylvania.

Submitted on Briefs Nov. 22, 2002.

Decided May 13, 2003.

Christian A. Davis, Philadelphia, for petitioner.

Thomas D. Aristide, Bethlehem, for respondent.

BEFORE: PELLEGRINI, Judge, LEAVITT, Judge, and KELLEY, Senior Judge.

OPINION BY Judge LEAVITT.

St. Luke's Hospital (Employer) petitions for review of an adjudication of the Workers' Compensation Appeal Board (Board) that granted a reinstatement of total disability benefits to Harriet Ingle (Claimant). In doing so, the Board affirmed the decision of the Workers' Compensation Judge (WCJ) that Claimant, who was being paid partial disability benefits while she worked at a modified-duty position, should not bear the consequences of a discharge arising, as it did, from a criminal offense, not work-related misconduct. Accordingly, Employer was ordered to reinstate Claimant's total disability benefits.

The background to this appeal is as follows. Claimant injured her left shoulder on November 30, 1995, in the course of her employment as a licensed practical nurse. After surgery, Claimant returned to work in October of 1996 in a modified-duty position[1] in Employer's admissions office, working twenty hours a week. Accordingly, Claimant received partial disability benefits[2] to supplement the wages she earned as an admissions clerk. On August 4, 1998, when Employer learned that criminal charges of child abuse had been lodged against Claimant, it discharged her. Nevertheless, Employer continued to pay Claimant partial disability benefits to account for the loss of earning power caused by her injury. On April 20, 1999, Claimant filed a reinstatement petition and a petition for penalties asserting that as of the date of her discharge, she became entitled to total disability benefits.[3] A hearing was held on Claimant's petitions.

---

1. Claimant was not able to return to her pre-injury job because she was restricted from lifting anything over twenty pounds, especially with her left arm. Claimant is left handed. Reproduced Record 29a (R.R. ___).

2. Claimant's total disability benefits had been $432.23 based upon an average weekly wage of $649. Her partial disability payments were $280.41. R.R. 4a.

3. Claimant asserted that her discharge was through no fault of her own and that Employer should have voluntarily reinstated total disability benefits as of the date of her termination from employment. Claimant also filed a Petition for Penalties requesting 50% penal-

Claimant testified about her modified-duty position as an admissions clerk. This position had initially required regular contact with the public, including children, but at the time of her discharge Claimant's job duties consisted of processing insurance claims, which involved infrequent public contact.[4] Claimant had a good employment history, and in her eight years with Employer, she had never been reprimanded or disciplined. After Claimant's arrest for simple assault and endangering the welfare of her nine-year-old stepson, which was reported in local newspapers, she was contacted by Robert P. Zimmel, Vice President for Human Resources, and informed that she was being suspended pending investigation. Thereafter, she was informed by letter that her employment was terminated effective August 7, 1998. On May 12, 1999, nine months after she was fired, Claimant pled guilty to simple assault and was sentenced to probation.

In defense, Mr. Zimmel testified on behalf of Employer. In addition, Employer presented copies of two newspaper articles,[5] detailing Claimant's alleged child abuse, and a copy of the criminal information[6] filed against Claimant.

Mr. Zimmel explained that he made the decision to discharge Claimant, and he defended his decision because, in his words, Employer did not want to employ a child abuser.[7] Indeed, as far as Mr. Zimmel knew, not one of Employer's three thousand employees had ever been charged with criminal assault. He acknowledged that the employee handbook did not address this precise situation and that Employer had not adopted a written policy on employee criminal conduct. The newspaper articles, which identified Claimant as an employee of St. Luke's Hospital,[8] contained a lurid account of the injuries suffered by Claimant's stepson and by another of her stepchildren for which Claimant had been arrested for one year earlier. Employer considered Claimant responsible for her discharge, and Mr. Zimmel confirmed that but for her arrest, Claimant would have not been discharged.

On March 23, 2000, the WCJ granted Claimant's reinstatement petition but denied her penalty petition. The WCJ found the testimony of both Claimant and Mr.

ties on the past due compensation and legal fees. R.R. 2a–7a. The WCJ's denial of the Penalty Petition was not in the appealed to the Board, R.R. 14a–15a, 20a. n. 1, and is not part of the appeal before this Court.

4. However, Employer contended that virtually every employee has interaction with the public. R.R. 74a.

5. The newspaper articles were headlined "Stepmom charged with abuse" and "Child Abuse Victim: I was tired of being hit all the time." The first article detailed the abusive act, which prompted the nine-year old to "run away from home" and go to the police. The second article detailed Claimant's earlier arrest in a 1997 incident involving her fourteen-year old stepdaughter; it identified St. Luke's Hospital as Claimant's employer. R.R. 52a, 53a.

6. The criminal information and criminal complaint confirmed the newspaper accounts. R.R. 54–58a.

7. On cross-examination, Mr. Zimmel admitted that prior to discharging Claimant, he did not investigate Claimant's work history with Employer because he did not consider it relevant.

8. The WCJ and the Board held that Employer did not suffer adverse publicity. This is not so. The articles themselves demonstrate publicity; the description of the abusive incidents and the identification of such a perpetrator with Employer is publicity that can only be considered negative and unwanted. Perhaps what the WCJ and the Board meant was the Employer did not show harm from this adverse publicity, but such a demonstration would be nearly impossible to make with empirical evidence.

Zimmel credible. However, he found that there was no evidence of misconduct by the Claimant with respect to her employment, and, therefore, "employer's firing of the claimant was unjustified." Conclusion of Law, No. 3, R.R. 12a. Employer filed an appeal to the Board, which affirmed the WCJ. Employer now seeks this Court's review [9] of the decision.

On appeal, Employer asserts several errors by the WCJ, but the heart of its appeal is that Claimant's loss of earnings after August 4, 1998, was a result of her actions, not her injury. In addition, Employer asserts that the WCJ failed to issue a reasoned opinion; [10] that Claimant's guilty plea to simple assault on May 12, 1999, should have resulted in a termination of total disability benefits; and that the WCJ's finding of fact that Claimant's stepson had a history of psychological problems [11] was not supported by substantial evidence.

■ A claimant seeking reinstatement of total disability payments bears the burden of proof. As explained by our Supreme Court in *Pieper v. Ametek–Thermox Instruments Division*, 526 Pa. 25, 34, 584 A.2d 301, 305 (1990), this burden is composed of two parts. First, the claimant must prove that, through no fault of his own, earning power is once again adversely affected by his disability. Second, the claimant must prove that the disability that gave rise to his original claim, in fact, continues. Here, there is no dispute about the second point; Employer agrees that Claimant's injury continues to affect her earnings.[12] Employer contends, however,

9. This Court's review is limited to determining whether an error of law was committed, whether constitutional rights were violated, or whether necessary findings of fact are supported by substantial evidence. *Dworek v. Workmen's Compensation Appeal Board (Ragnar Benson, Inc. & National Union Fire Insurance Co.)*, 166 Pa.Cmwlth.512, 646 A.2d 713 (1994). This standard is required by the Administrative Agency Law, 2 Pa.C.S. § 704. Further, this standard is not affected by our Supreme Court's recent holding in *Wintermyer, Inc. v. Workers' Compensation Appeal Board (Marlowe)*, 571 Pa. 189, 812 A.2d 478 (2002).

10. Section 422 of the Workers' Compensation Act, Act of June 2, 1915, P.L. 736, *as amended*, 77 P.S. § 834, provides:

All parties to an adjudicatory proceeding are entitled to a reasoned decision containing findings of fact and conclusions of law based upon the evidence as a whole which clearly and concisely states and explains the rationale for the decisions so that all can determine why and how a particular result was reached. The workers' compensation judge shall specify the evidence upon which the workers' compensation judge relies and state the reasons for accepting it in conformity with this section. When faced with conflicting evidence, the workers' compensation judge must adequately explain the reasons for rejecting or discrediting competent evidence. Uncontroverted evidence may not be rejected for no reason or for an irrational reason; the workers' compensation judge must identify that evidence and explain adequately the reasons for its rejection. The adjudication shall provide the basis for meaningful appellate review.

11. In Finding of Fact No. 17, the WCJ finds that an investigation of the charges against Claimant would have revealed that Claimant's stepson was treated, and institutionalized, for psychological problems. However, the record shows that Claimant's stepson required treatment only *after* the incident in question, which also resulted in his being placed in foster care. R.R. 11a. Thus, Employer asserts that Finding of Fact No. 17 is not supported by substantial evidence.

Finding of Fact No. 17 is irrelevant and inexplicable. A criminal assault upon a nine-year-old boy, even one who is psychologically disturbed, cannot be justified.

12. Employer does not dispute Claimant's right to partial disability benefits because she remained partially disabled and unable to return to her pre-injury job as a licensed practical nurse. Employer concedes that Claimant remains unable to perform her pre-injury position as an LPN. Brief of Petitioner, p. 8.

that Claimant has failed to prove that her loss of earnings from the job as admissions clerk occurred through "no fault of her own."

The meaning and application of the two-prong *Pieper* test has been reviewed in several recent decisions of our Supreme Court. They address, in particular, the circumstances under which claimants are entitled to reinstatement of total disability benefits after discharge by their employer.

In *Hertz–Penske Truck Leasing Co. v. Workmen's Compensation Appeal Board (Bowers)*, 546 Pa. 257, 684 A.2d 547 (1996), the Supreme Court cautioned against conflating the standards for an award of unemployment compensation benefits with those for an award of workers compensation benefits. It held that,

> [s]ince *the purpose of the Act is purely to compensate a claimant for his work-related injury,* the dispositive element in the suspension analysis under Section 772 is the status of the injury. Issue of misconduct or fault, if any, on the part of a claimant do not impact on this determination. Accordingly, we believe that Commonwealth Court erred by extending the fault-based concept of "willful misconduct" or "good cause" from the unemployment compensation arena into the realm of worker's compensation law.

*Id.* at 261, 684 A.2d at 549 (emphasis added). Accordingly, the Court held that "the relevant inquiry is whether the claimant's loss in earnings was the result of claimant's work injury." *Id.* at 262, 684 A.2d at 549.

■ In *Vista International Hotel v. Workers' Compensation Appeal Board*

*(Daniels)*, 560 Pa. 12, 26 n. 9, 742 A.2d 649, 656 n. 9 (1999), our Supreme Court clarified that *Hertz–Penske* "does not stand for the proposition that fault is never relevant in a workers' compensation proceeding." It addressed the impact of a discharge upon both partial and total disability benefits, reasoning as follows:

> ... [A]s a general rule, where a work-related disability is established, a post-injury involuntary discharge should be considered in connection with the separate determination of job availability rather than as dispositive of loss of earnings capacity .... *this approach has the advantage of also permitting consideration of the claimant's good or bad faith in connection with the termination since fault-based considerations traditionally have been deemed relevant in determining whether the employer has met its burden of establishing job availability* .... Thus, under this approach, *a partially disabled employee who, by act of bad faith, forfeits his employment would not be eligible for total disability benefits, as suitable employment was in fact available but for the employee's own wrongful conduct.* Conversely, a partially disabled employee who acts in good faith to undertake work with restrictions would not be deprived of benefits that he plainly would have received had no light duty employment been offered *merely because the employer subsequently elects to terminate such employment.*

*Id.* at 27–28, 742 A.2d at 657–658 (emphasis added). In the case of a partially disabled employee, both the employer and the claimant must act in good faith with respect to suitable employment.[13] The rel-

---

13. For example, the employer cannot create and eliminate a modified-duty position in short order simply to reduce its obligation to pay disability benefits. Similarly, the claim-

ant cannot consciously do a poor job in the hopes of a discharge and return to total disability benefits.

evant inquiry is availability of a suitable position. Thus, the Supreme Court in *Vista* concluded as follows:

> [W]e hold that a claimant who has established a partial disability due to a work-related injury should generally continue to receive partial disability benefits by virtue of his loss in earnings capacity, even though subsequently discharged from employment, because the loss in earnings capacity remains extant. Whether the same claimant may receive total disability benefits depends upon whether *the employer can demonstrate that suitable work was available or would have been available but for circumstances which merit allocation of the consequences of the discharge to the claimant, such as claimant's lack of good faith.*

*Id.* at 29, 742 A.2d at 658 (emphasis added).

■ Since *Vista*, our Supreme Court has held that where a claimant does not have the *ability* to perform in a modified-duty position and is discharged, then the loss of earnings will be found attributable to his injury. *Stevens v. Workers' Compensation Appeal Board (Consolidation Coal Company)*, 563 Pa. 297, 760 A.2d 369 (2000); *Bethlehem Steel Corporation v. Workers' Compensation Appeal Board (Laubach)*, 563 Pa. 313, 760 A.2d 378 (2000). The Supreme Court has continued to reiterate that the claimant's burden un-der *Pieper* is to establish that his earning power was adversely affected by his injury through no fault of his own. *Stevens*, 563 Pa. at 310–311, 760 A.2d at 376–77.[14]

■ Under *Vista*, then, availability of suitable work is the focus, and a reinstatement of total disability benefits will not be permitted where work was available "or would have been available *but for circumstances* which merit allocation of the consequences of the discharge to the Claimant, *such as* Claimant's lack of good faith." *Vista*, 560 Pa. at 29, 742 A.2d at 658 (emphasis added). This allocation is not limited to the circumstance where a claimant acts in bad faith with respect to the "suitable work available." The Supreme Court identified bad faith as one example, of presumably many, of a circumstance that will warrant allocating the consequences of a discharge to the claimant. Further, *Hertz–Penske* has not been overruled. It is still the obligation of a claimant to demonstrate that loss of earnings is attributable to the work-related injury and not to some other reason.

Here, Claimant lost her job because of her criminal conduct, which was, as found by the WCJ, unrelated to her conduct in the workplace. However, Claimant's criminal conduct, which resulted in the termination of her employment, did not transform her into totally disabled person. She was able to do the job as an admissions

---

14. By no means does a discharge from a modified-duty position lead to a termination of all disability benefits. *Howze v. Workers' Compensation Appeal Board (General Electric Company)*, 714 A.2d 1140 (Pa.Cmwlth.1998); *Barnett v. Workers' Compensation Appeal Board (Paul Riggle & Sons)*, 718 A.2d 901 (Pa.Cmwlth.1998). In *Howze*, claimant was discharged for threatening a fellow employee in the work place. In *Barnett*, Claimant was discharged for refusing to undergo federally mandated drug testing. In both cases, this Court determined that the claimant was enti-tled to receive partial disability benefits because the claimants continued to suffer a partial loss of earnings attributable to their injuries; however, they were not entitled to reinstatement of total disability benefits. *Cf., Champion v. Workers' Compensation Appeal Board (Glasgow, Inc.)*, 753 A.2d 337 (Pa. Cmwlth.2000) (wherein we upheld the WCJ's conclusion that Claimant's discharge did not result from his lack of a good faith and, thus, entitled him to reinstatement of total disability benefits).

clerk and would still be doing that job but for her criminal assault upon a nine-year-old boy committed to her care. One of the consequences of this conduct was her discharge from employment, and so Claimant, not Employer, is responsible for the lack of available suitable work. Employer showed that suitable work was available to Claimant "but for circumstances which merit allocation of the consequences of the discharge" to Claimant. *Vista,* 560 Pa. at 29, 742 A.2d at 658. Accordingly, Claimant forfeited her job as an admissions clerk.

The WCJ and the Board made the very error *Hertz–Penske* attempted to terminate: they inquired into Claimant's discharge as if confronting a dispute over eligibility for unemployment compensation. Their findings applied a willful misconduct standard.[15] Thus, they made findings of no moment in a workers' compensation hearing: that Claimant had not been warned that a criminal charge for conduct unrelated to the workplace could lead to a discharge; that Claimant did not violate a work rule or policy of Employer; that Claimant had not been disciplined for work-related conduct; and that Claimant had been "fired" without justification. The WCJ and the Board improperly extended the concept of willful misconduct from the unemployment compensation arena into the realm of workers' compensation law. *Hertz–Penske,* 546 Pa. at 261, 684 A.2d at 549.

 A claimant seeking reinstatement of total disability benefits must bear the consequences of criminal convictions, or the results will be illogical. A serious crime of physical violence against a child will not be deemed a job forfeiture but tardy attendance will. Under the Board's holding convicted criminals can be rewarded with total disability benefits without having to show that it is the work-related injury, not the notoriety surrounding the criminal charges and conviction, that has affected a loss of earnings.

 Accordingly, we hold that the consequence of Claimant's criminal conduct was to shift the burden of proof to her on the "relevant injury" of whether Claimant's loss in earnings was the result of her work-related injury. *Hertz–Penske,* 546 Pa. at 262, 684 A.2d at 549. In order for Claimant to have her total disability benefits reinstated, she had to prove a worsening of her medical condition to the point that she could no longer perform the modified-duty position from which she was discharged. *Signorini v. Workmen's Compensation Appeal Board (United Parcel Service),* 664 A.2d 672, 676 (Pa.Cmwlth. 1995) (wherein we held that "[w]here a claimant is discharged for willful misconduct, he must show a change in circumstances, for instance, that his medical condition has worsened to the point that he can no longer perform the job he had been doing at the time of his discharge"). Because Claimant did not offer evidence of a worsening of her condition, her reinstatement petition should have been denied.[16]

For these reasons, we reverse the Board.

Judge PELLEGRINI dissents.

### ORDER

AND NOW, this 13th day of May, 2003, the order of the Workers' Compensation Appeal Board dated May 17, 2002, in the

---

**15.** However, in doing so, the Board did not use the words "willful" or "misconduct."

**16.** Because we find in favor of Employer, we need not address the other issues it has raised to support a reversal of the Board.

above-captioned matter, is hereby reversed.