**Patricia TROUT, Petitioner,**

v.

**WORKERS' COMPENSATION APPEAL BOARD (TRANS CONTINENTAL REFRIGERATED), Respondent.**

Commonwealth Court of Pennsylvania.

Submitted on Briefs Aug. 22, 2003.
Decided Nov. 19, 2003.

---

Michael G. Dryden, Philadelphia, for petitioner.

William E. Wyatt, Jr., Scranton, for respondent.

BEFORE: FRIEDMAN, Judge, and COHN, Judge, and McCLOSKEY, Senior Judge.

OPINION BY Judge FRIEDMAN.

Patricia Trout (Claimant) petitions for review of the May 13, 2003, order of the Workers' Compensation Appeal Board (WCAB) reversing the decision of a workers' compensation judge (WCJ) to grant Claimant's reinstatement petition. We reverse.

Claimant sustained a knee injury in the course and scope of her employment as a truck driver with Trans Continental Refrigerated (Employer)[1] on December 19, 1996, and received workers' compensation benefits pursuant to a Notice of Compensation Payable. These benefits continued until Claimant returned to a light-duty job with Employer checking refrigerated loads at a site near Claimant's home in Somerdale, New Jersey. (WCJ's Findings of Fact, No. 3.) When this job expired, Claimant was reinstated on workers' compensation until benefits again were suspended in February of 2001, when Claimant returned to light-duty work with Employer as a traveling field recruiter with no loss of earnings. In the field recruiter position,

---

1. In the Petition for Review to this court, Employer is referred to as Trans Continental Refrigerated; however, elsewhere in the record, Employer is called Transcontinental Refrigerated Lines, Inc.

Claimant was provided with a company vehicle and was required to visit truck stops within a 100 to 150–mile radius of her home to recruit truck drivers for Employer. (WCJ's Findings of Fact, No. 4.) Claimant worked in this position until June 21, 2001, when she was told she would be transferred to Employer's Pittston, Pennsylvania location, which is 150 miles from Claimant's home. Claimant found she could not continue in the recruiter position once she was transferred because working in Pittston involved a daily commute of three-hours each way and meant that she could not get back home following her work day. (WCJ's Findings of Fact, No. 5.) She notified Employer of her dilemma and declined to accept the transfer. On July 3, 2001, Claimant filed a petition for reinstatement of her workers' compensation benefits, alleging that she was once again disabled from her December 19, 1996, work-related injury. (WCJ's Findings of Fact, Nos. 1 and 5.)

At a hearing on the matter,[2] Claimant testified on her own behalf and explained the circumstances that necessitated her departure from her employment with Employer. Claimant testified that, when she took the field recruiter job initially, she understood that she would be traveling from truck stop to truck stop within a hundred mile radius of her home to try and recruit drivers for Employer. However, within a week, she was told that there was not enough work for her within that distance, and she would have to go outside the area initially prescribed.[3] Claimant accepted that change, as well as two pay cuts, without complaint. (R.R. at 9a–11a.) Claimant testified that she had never been told that there was a problem with her work, and she was never disciplined; however, on June 21, 2001, about four months after she began, Claimant was informed that she would no longer be a field recruiter. Instead, she was told that she would work permanently out of Employer's Pittston office and had to recruit from that location six days a week.[4] (R.R. at 12a, 20a.)

Claimant admitted that no one at Employer fired her. (R.R. at 27a.) Claimant

2. For some reason, Claimant failed to appear and present her case at a September 27, 2001, hearing, and, as a result, her reinstatement petition was dismissed. Claimant appealed the dismissal to the WCAB and filed a second reinstatement petition, again alleging that her disability recurred on June 21, 2001. Thereafter, Employer filed a petition to terminate Claimant's compensation benefits, alleging that, as of February 28, 2002, Claimant had fully recovered from her work injury. By agreement of the parties, the WCAB remanded Claimant's second reinstatement petition, and the WCJ consolidated the two reinstatement petitions for a hearing on May 9, 2002. (WCJ's Findings of Fact, No. 2.) The WCJ did not include Employer's termination petition in the consolidation but indicated that the termination petition would be scheduled for hearing at a later time.

3. Claimant testified that, as a field recruiter, she sometimes worked closer to her home, while, on other occasions, she would travel to truck stops as far away as Harrisburg and even farther, staying away for several days when she did so. (R.R. at 23a–25a.)

4. Claimant stated that, although she went through a training session before she started working as a field recruiter, she was not told that there would be a certain number of applications required monthly. According to Claimant, only after a second wage reduction did Employer inform her that she would receive a bonus for applications in excess of a certain amount and would lose money for each application less than fifteen. (R.R. at 18a–19a.) Claimant agreed that by April or May, her number of applications had dropped off significantly; however, she stated that her failure to generate the required number of applications was not the reason given for her transfer. Claimant testified that, when she was told to report permanently to Pittston, she was given no reason other than she was needed there now. (R.R. at 19a–21a.)

stated that she called her supervisor, Fred Magnotta, and left a voice mail message indicating her decision not to accept the permanent position in Pittston. Claimant explained that Pittston was 150 miles from her home, and the 300–mile, six-hour daily commute, combined with the required minimum fifty-hour work week, (R.R. at 73a, 79a), would create a hardship for her. (R.R. at 13a, 28a, 30a.) As Claimant stated, "[e]ven with traveling outside the one hundred mile radius, there was still a substantial amount of time that I could be near the house with the outside recruiting job. Being stationed up here six days a week, I would have no time at all at home." (R.R. at 30a.) Claimant testified that she never quit or left the original field recruiter job and would return to that position.[5] (R.R. at 13a.)

Employer defended against Claimant's reinstatement petition by contending that Claimant voluntarily quit her employment, thereby creating her own temporary total disability status. In furtherance of this position, Employer presented the testimony of Fred Magnotta, Claimant's immediate supervisor.[6] (WCJ's Findings of Fact, No. 6.) Magnotta testified that Claimant initially performed well as a recruiter, but when her numbers started to fall off in April or May, he made the decision to move Claimant to Pittston, Employer's best recruiting spot, where she would be required to report eleven out of every fourteen days. (R.R. at 37a–39a, 43a–45a.)

Magnotta acknowledged that, in Claimant's original position as a field recruiter, she did not have to stay in any place for a specific period of time. He stated "there [are] times you're away from home a lot," but "you're pretty much on your own ... you're your own boss." (R.R. at 35a, 54a–55a.) Magnotta also admitted that, in offering the original field recruiter position to Claimant, Employer specified a range within which Claimant would be expected to recruit drivers, and Magnotta conceded that, at 150 miles from Claimant's home, Pittston was further than any of these locations. (R.R. at 54a.) However, according to Magnotta, Claimant's transfer to the Pittston location was not permanent; rather, she was placed there temporarily, until her volume of driver applications increased dramatically.[7] Magnotta felt that this transfer actually was a way of helping Claimant, whose applications were falling off in her New Jersey location, to see if she could improve. (WCJ's Findings of Fact, No. 7; R.R. at 40a, 44a–45a.)

After considering this testimony, the WCJ made the following relevant findings:

8. Under the circumstances, we do not find that either party acted unreasonably. We understand that it was difficult for the Claimant living in Somerdale, New Jersey to work in Pittston every day but we can also understand the Employer's position that the Claimant was required to travel whether she was based in Somerdale or Pittston. Nevertheless, if she had to travel 150

---

5. Claimant testified that she was unable to resume her pre-injury position as a truck driver because of the continuing pain in her knee. (R.R. at 15a.)

6. Richard Jones, Employer's Director of Risk Management, also testified before the WCJ; however, the WCJ made no findings with respect to his testimony.

7. Although Magnotta testified that the transfer was temporary and intended to help Claimant improve her work performance, Magnotta also admitted that the time period was open ended and, because her assignment there was performance related, he had no idea how long it would last. Magnotta acknowledged that he did not inform Claimant that the transfer was to be temporary. (R.R. at 40a, 45a–46a.)

miles to and from work every day it would be a hardship for her.

9. Keeping in mind that the Workers' Compensation Act [(Act)[8]] is a remedial piece of legislation and also looking at the Claimant's past work history wherein she worked steadily as a truck driver and then as a reefer checker, we do not find the Claimant's motives in terminating her employment with [Employer] when she was transferred to Pittston were in bad faith but rather were done out of practicality.

10. We do not find any fault with [Employer], after all they are a business and had a legitimate reason to try to increase the Claimant's productivity. Unfortunately, their efforts should have been concentrated closer to the Claimant's home or it should have been made clear to the Claimant that her relocation, away from home was only a temporary transfer.

11. We find under the circumstances that the Claimant is out of work through no fault of her own and is still suffering from the residuals of her work injury thus her benefits should be reinstated. We understand that the Employer also feels that the Claimant has recovered from her work injury and can return to work anywhere but that litigation is for another day.

(WCJ's Findings of Fact, Nos. 8–11.) Based on these findings, the WCJ concluded that suitable work no longer was available to Claimant in her locale, and, therefore, Claimant's workers' compensation benefits should be reinstated. (WCJ's Conclusions of Law, No. 2.)

Employer appealed to the WCAB, again asserting that Claimant had voluntarily left her employment and, therefore, reinstatement of benefits was not appropriate. The WCAB agreed with Employer and reversed the WCJ, concluding that Claimant created her own loss of earnings when she voluntarily quit her light-duty job for reasons unrelated to the work-related injury.

Claimant now petitions this court for review,[9] arguing that the WCAB erred by reversing the WCJ's reinstatement of Claimant's benefits. Claimant asserts that the WCAB applied the wrong standard in evaluating whether reinstatement was appropriate because the evidence establishes that Claimant did not voluntarily quit an ongoing available light-duty job, but, instead, declined to accept a newly offered light-duty position that was unavailable to her. We agree with Claimant.

■ A claimant seeking reinstatement following a suspension of benefits must demonstrate that: (1) through no fault of his or her own, the claimant's earning power is once again adversely affected by his or her disability; and (2) the disability which gave rise to the original claim continues. *Latta v. Workmen's Compensation Appeal Board (Latrobe Die Casting Co.)*, 537 Pa. 223, 642 A.2d 1083 (1994); *Pieper v. Ametek–Thermox Instruments Division*, 526 Pa. 25, 584 A.2d 301 (1990).

In concluding that Claimant did not satisfy this burden of proof, the WCAB likened Claimant's situation to that of the claimants in *Campbell v. Workers' Compensation Appeal Board (Foamex)*, 707 A.2d 1188 (Pa.Cmwlth.1998), and *Beattie v.*

---

**8.** Act of June 2, 1915, P.L. 736, *as amended,* 77 P.S. §§ 1–1041.4, 2501–2626.

**9.** Our scope of review is limited to determining whether constitutional rights were violated, whether the adjudication is in accordance with the law or whether necessary findings of fact are supported by substantial evidence. Section 704 of the Administrative Agency Law, 2 Pa.C.S. § 704.

*Workers' Compensation Appeal Board (Liberty Mutual Insurance Co.)*, 713 A.2d 187 (Pa.Cmwlth.1998).[10] In each of those cases, the claimant sustained a work-related injury and had benefits suspended after returning to modified work without a loss of wages. Subsequently, each claimant left the modified position which served as the basis for the suspension of benefits and sought reinstatement of total disability benefits. In each case, this court held that, because the claimant voluntarily quit his job for personal reasons, his loss of earning power was unrelated to his disability and, therefore, reinstatement of benefits was unjustified.[11]

Applying this same reasoning to the present circumstances, the WCAB determined that Claimant did not leave her light-duty job with Employer for reasons related to her work injury; rather, she voluntarily quit that job after finding it a hardship to travel the required 300 mile round trip between Pittston and her home. Therefore, the WCAB held that, like the claimants in *Campbell* and *Beattie*, Claimant was not entitled to a reinstatement of benefits. However, in reaching this conclusion, the WCAB ignores a crucial distinction between the claimants in *Campbell* and *Beattie* and Claimant here. Unlike the claimants in those cases, *Claimant here did not voluntarily leave the modified position that served as the basis for the suspension of her benefits; to the contrary, Claimant would have remained in her original light-duty position* as a field recruiter. However, Employer denied Claimant that opportunity and conditioned Claimant's continued employment on her assuming a position that would not have qualified as "available" to suspend or mod-

10. The WCAB cited *Pappans Family Restaurant v. Workers' Compensation Appeal Board (Ganoe)*, 729 A.2d 661 (Pa.Cmwlth.1999), wherein this court explained the distinction between a reinstatement following a voluntary quit and a reinstatement following a termination by an employer, stating:

> The distinguishing element in both *Campbell* and *Beattie*, is the fact that, in both cases, it was the claimant who voluntarily made the decision to leave his position. Clearly, in both of those cases, the claimants' actions directly caused the loss of earning power, and, accordingly, in each case, it was the **claimant's** burden to establish that he removed himself from the workforce for reasons related to his work injury.

729 A.2d at 667 (emphasis in original). According to the WCAB, because it involved a voluntary quit, "the instant case has the same distinguishing element as that found by the Court in *Campbell* and *Beattie*." (WCAB op. at 5.)

11. In *Campbell*, the claimant sustained a work-related injury to his lower back and began receiving benefits pursuant to a notice of compensation payable. Subsequently, the employer found the claimant a limited duty part-time position as a security guard with another employer, which was approximately thirty-five miles from his home. Soon after the claimant took this job, his wife took possession of their only car in divorce proceedings, and the claimant quit due to lack of transportation. The claimant then filed a petition for reinstatement of temporary total disability benefits alleging that he could no longer be employed in the security guard position through no fault of his own. The issue presented was whether a claimant who continues to be disabled, is entitled to reinstatement of benefits when he quits *suitable* alternative employment because his sole source of transportation is no longer available. We held that the claimant's quitting his job due to lack of transportation did not justify reinstatement of his benefits because his loss of earning power was unrelated to his disability.

In *Beattie*, the claimant sustained a disabling work-related injury. Subsequently, his benefits were suspended when the claimant returned to work as a church minister for another employer without a wage loss. However, the claimant became uncomfortable with the position and, eventually, quit because of stress and interpersonal problems. Under these circumstances, the court concluded that he was not entitled to reinstatement of total disability benefits.

ify her benefits in the first instance.[12] To deny Claimant reinstatement of total disability benefits under these circumstances would invite abuse and contravene the remedial purpose of the Act.

The record establishes, and the WCJ found, that Employer made a business decision to remove Claimant from the field recruiter position she had agreed to perform and to reassign her to work only in a specific location. While Claimant would have the same job duties in the new locale, the transfer to Pittston required significantly more travel and offered none of the flexibility of her former field recruiter job.

Although recognizing that Employer's decision was a prudent one, the WCJ also understood the hardship this "new" position would impose on Claimant, and the WCJ appropriately found that Claimant's decision not to accept the required transfer was based on practicalities rather than bad faith.[13] Thus, the WCJ properly concluded that, because suitable work was no longer available to Claimant, Claimant was out of work through no fault of her own, and her workers' compensation benefits should be reinstated. *See Busche v. Workmen's Compensation Appeal Board (Townsend and Bottum, Inc.)*, 77 Pa.

---

**12.** When an employer that seeks to modify a claimant's benefits refers a partially disabled claimant to a modified-duty position, the employer has the burden of establishing that the position actually is available to the claimant. *Kachinski v. Workmen's Compensation Appeal Board (Vepco Construction Co.)*, 516 Pa. 240, 532 A.2d 374 (1987). In considering whether a job actually is available, the claimant's place of residence relative to the job is a relevant consideration. *Dilkus v. Workmen's Compensation Appeal Board (John F. Martin & Sons)*, 543 Pa. 392, 671 A.2d 1135 (1996), quoting *Kachinski*. If an offered position is within the geographic area where others in the same community as Claimant would accept employment, the claimant's preference is irrelevant, and the job is available geographically. *Scheib v. Workmen's Compensation Appeal Board (Ames Department Store)*, 143 Pa. Cmwlth.193, 598 A.2d 1032 (1991).

The undisputed facts here are that Claimant lives in Somerdale, New Jersey, and the job transfer was for a position in Pittston, Pa., 150 miles from Claimant's home. To perform the job, Claimant would be required to drive 300 miles, a six-hour round trip, daily. Employer has introduced no evidence that residents of Somerdale look for and accept work in Pittston, and, in fact, Pennsylvania case law establishes that requiring a claimant to undertake such a commute in addition to a fifty-hour work week is unreasonable as a matter of law. *See e.g., Litzinger v. Workers' Compensation Appeal Board (Builders Transport)*, 731 A.2d 258 (Pa.Cmwlth.1999) (holding that a job offer which required a claimant to make a daily round trip commute of 232

miles was unreasonable even though the claimant would be provided with a motel room because this would require the Claimant to be away from home at least four nights a week); *Karpulk v. Workers' Compensation Appeal Board (Worth and Co.)*, 708 A.2d 513, (Pa.Cmwlth.), *appeal denied*, 557 Pa. 633, 732 A.2d 617 (1998) (holding that a 150–mile round trip commute was unreasonable where, due to medical limitations, the trip would take the claimant five hours); *Womeldorf, Inc. v. Unemployment Compensation Board of Review*, 59 Pa.Cmwlth. 627, 430 A.2d 722 (1981) (holding that the necessity either to relocate or commute 80–100 miles each way daily constituted good cause for the claimant to decline reassignment). In other words, by instituting the transfer to Pittston, Employer made the formerly suitable recruiter job unavailable to Claimant.

**13.** Indeed, the record indicates that Claimant was not opposed to work-related travel, even when it was considerable. The initial light duty position held by Claimant was located close to Claimant's home, and, when this position ended, Claimant accepted the field recruiter position that required her to travel up to a 100 mile radius from her home. Claimant remained in this job even after Employer widened that territory and reduced her earnings; indeed, Claimant never voluntarily left her field recruiter position. To the contrary, Claimant left her employment only after Employer transferred Claimant from that position and placed her in a job that required a six-hour daily commute.

Cmwlth.469, 466 A.2d 278 (1983) (holding that where the employer discontinues a specially created job, the employer must offer another suitable job to the claimant or continue total disability payments); *Economy Decorators, Inc. v. Workmen's Compensation Appeal Board (Federici),* 96 Pa.Cmwlth.208, 506 A.2d 1357 (Pa. Cmwlth.1986) (stating that, because a presumptive partial disability exists by virtue of a suspension of benefits, where the claimant suffers reduced earnings due to a work slowdown, an employer can avoid reinstatement of benefits only by offering suitable work); *Southeastern Pennsylvania Transportation Authority (SEPTA), v. Workmen's Compensation Appeal Board (Pointer),* 145 Pa.Cmwlth.539, 604 A.2d 315 (1992) (recognizing that in suspension situations, when a claimant's light-duty job ends under circumstances where neither the claimant nor the employer bears any culpability, the employer must either find other suitable and available work for the claimant or resume payment of benefits).

Accordingly, we reverse.

### ORDER

AND NOW, this 19th day of November, 2003, the order of the Workers' Compensation Appeal Board, dated May 13, 2003, is hereby reversed.