**Michael HORNE, Petitioner**

v.

**WORKERS' COMPENSATION APPEAL BOARD (CHALMERS & KUBECK), Respondent.**

**Chalmers & Kubeck, Petitioner**

v.

**Workers' Compensation Appeal Board (Horne), Respondent.**

Commonwealth Court of Pennsylvania.

Submitted on Briefs Nov. 21, 2003.

Decided Jan. 7, 2004.

Eugene Mattioni, Philadelphia, for petitioner.

Lee S. Fiederer, Blue Bell, for respondent.

BEFORE: FRIEDMAN, Judge, COHN, Judge, and McCLOSKEY, Senior Judge.

OPINION BY Senior Judge McCLOSKEY.

This case involves the cross-petitions for review of Michael Horne (Claimant) and Chalmers & Kubeck (Employer) from an order of the Workers' Compensation Appeal Board (Board), affirming the decision of the Workers' Compensation Judge

(WCJ), granting Claimant's claim petition.[1] We now affirm in part and reverse and remand in part.

Employer employed Claimant as an industrial mechanic beginning on November 30, 1998. Claimant's job duties included overhauling valves of all different sizes both on-site at Employer's facility and off-site at facilities which contracted with Employer for such work. At this job, Claimant earned $15.00 per hour and he worked forty hours per week.[2] In the course and scope of his employment on January 22, 1999, Claimant sustained injuries to his legs, primarily his left leg, when a ladder he was climbing slipped out from under him and he fell to the ground. As he was falling, Claimant's left leg became entangled in the rungs of the ladder. Employer does not dispute that Claimant sustained work-related injuries as a result of this accident.

Despite the accident, it appears from the evidence of record that Claimant only missed one day of work, for which he was compensated by Employer. Claimant returned to light-duty work with Employer, mainly secretarial-type work in one of Employer's offices. In April of 1999, Claimant underwent surgery on his left knee to reconstruct his anterior cruciate ligament and to treat damaged meniscal cartilage. Claimant continued at this light-duty position until August of 1999, when he was released to full duty. Employer returned Claimant to light to medium-duty work as a mechanic in its shop. In September of 1999, Claimant began resuming his pre-injury work load, including off-site repairs.

Claimant was allegedly unable from a physical standpoint to fulfill the requirements of his pre-injury job and he sought less strenuous employment.[3] In November of 1999, Claimant voluntarily left Employer and began working for Langston Machine Manufacturing (Langston) in Cherry Hill, New Jersey. At this new job, Claimant worked forty hours per week in a managerial-type position at the rate of $18.00 per hour, plus an additional eight to twenty hours per week of overtime. Claimant continued working for Langston for approximately three months. As a result of economic reasons,[4] Langston was forced to reorganize in early 2000 and Claimant was laid off on February 9, 2000.

Claimant remained unemployed from the date of his layoff through April 23, 2000. Claimant worked for another company, Crane Valve, for two days, i.e., April 24 and 25, 2000, and thereafter remained unemployed for a couple of weeks. Claimant collected unemployment compensation benefits throughout his periods of unemployment. In early May of 2000, Claimant obtained employment with Production Plastics, Inc., in Mt. Laurel, New Jersey, in a production control and scheduling position. This position was a salaried position at the rate of $38,000.00 per year, which equates to an average weekly wage of approximately $731.00.

---

1. Although the WCJ granted Claimant's claim petition, as will be seen below, the WCJ did not award Claimant any wage loss benefits. Instead, the WCJ only awarded Claimant medical and litigation expenses.

2. This equates to a weekly wage of $600.00. However, as will be seen below, Claimant alleged that he routinely worked approximately ten hours of overtime per week at time-and-a-half, which equates to an additional $225.00 per week ($22.50 per hour times ten hours per week).

3. The reasons underlying Claimant's choice of employment are the primary issue in the context of his present appeal to this Court.

4. In his brief to this Court, Claimant characterizes his layoff from Langston as the result of "valid economic reasons." (Brief of Claimant at 3).

Nevertheless, Claimant continued to experience problems with his left knee during this employment. In November of 2000, Claimant saw Dr. Charles Hummer, III, who recommended that Claimant receive an injection in his knee of synovial fluid. Dr. Hummer's office contacted a representative of Employer's workers' compensation insurance company and was told that the company would not approve the procedure nor would the insurance company pay for Viox medication prescribed by Dr. Hummer. Claimant continued working for Production Plastics through December 16, 2000, at which time he was again laid off for economic reasons.[5]

Claimant's knee problems continued. Dr. Hummer referred Claimant to Dr. Gregory Maslow, an orthopedic surgeon. Following an examination, Dr. Maslow diagnosed Claimant as suffering from synovitis, an inflammation of the knee. Dr. Maslow recommended that Claimant undergo arthroscopic surgery to identify the precise nature of his condition as well as to clean out the area inside the knee. Dr. Maslow performed this surgery on March 26, 2001. Following the surgery, Dr. Maslow recommended and Claimant received Synvisc injections, an artificial lubricant and nutrient to promote cartilage growth. In addition, Claimant underwent a physical therapy program which lasted approximately four months.

In August of 2001, Claimant relocated to North Carolina in order to accept a position with Maola Milk and Ice Cream (Maola). Claimant began employment with Maola on August 7, 2001, at the rate of $13.50 per hour for forty hours per week. Claimant does not work overtime in this position. At Maola, Claimant maintains machinery and does some light mechanical work, such as checking machine oil levels and changing oil filters.

In the meantime, prior to his relocation, on January 5, 2001, Claimant filed a claim petition against Employer with respect to his January 22, 1999, work injury. Claimant indicated that his average weekly wage was $600.00. Claimant later amended his average weekly wage allegation to $825.00 per week which included his overtime work with Employer. Claimant sought periods of partial disability benefits, total disability benefits as of December 18, 2000, and payment of all work-related medical expenses. Employer filed an answer essentially denying the allegations of the petition. The case was assigned to the WCJ and proceeded with depositions and a hearing before the WCJ.

At this hearing, Employer acknowledged the fact that Claimant sustained a work-related injury to his left knee in the course and scope of his employment on January 22, 1999. Nevertheless, Employer contested Claimant's entitlement to any wage loss benefits subsequent to his voluntary departure in November of 1999. Employer also contested Claimant's calculation of his average weekly wage, i.e., including overtime in this calculation.

At this hearing, Claimant testified on his own behalf, relating a history of his work injury, his ongoing left knee problems and his subsequent attempts at employment.[6] Claimant also specifically testified as to his reasons for leaving Employer. In this regard, Claimant indicated that he remained in a light-duty capacity with Employer following his work injury for a period of approximately seven months, until the end

5. Claimant again referred to these economic reasons as "valid" in his brief to this Court. (Brief of Claimant at 4).

6. Claimant's testimony consisted of deposition testimony as well as live testimony before the WCJ.

of August of 1999. In September of 1999, he was performing light to medium-duty work in the mechanic's shop. Throughout this month, Claimant began resuming his pre-injury work duties, including off-site work.

However, Claimant indicated that his left leg began to bother him when he resumed these duties. Claimant indicated that he could not "physically do the requirements of the job, because [he] did not have good stability on [his] left leg when [he] was standing and working, especially off site." (R.R. at 19a). In mid to late September of 1999, Claimant began to consider other employment that "was not as physically strenuous." (R.R. at 112a). Claimant characterized his subsequent job at Langston as light-duty mechanical work.

On cross-examination, however, Claimant indicated that he had applications with Langston for the past five years, well before he even started with Employer. Claimant also indicated that he would make more money at Langston and that the job at Langston was closer to home. Additionally, on cross-examination, Claimant acknowledged that during the course of his employment with Employer, no one ever informed him that Employer was unhappy with his work and no one tried to force him to leave. To the contrary, Claimant indicated that his supervisor, Joseph J. O'Shea, had offered him help if he had any trouble performing his job duties.

With respect to his average weekly wage calculation, Claimant testified that he worked for Employer forty hours per week at the rate of $15.00 per hour and that he also worked a minimum of ten hours of overtime per week at a rate of time-and-a-half, for a total wage of $825.00 per week. On cross-examination, Claimant indicated that he could not recall if he had any paystubs from Employer to verify his wages prior to his work injury. However, Claimant indicated that he had a box of "tax stuff," which contained his W-2's for 1999 and 2000. (R.R. at 138a). Counsel for Employer asked that Claimant provide his counsel with these documents. However, based upon a review of the evidence of record, it does not appear that such documents were ever produced.

In further support of his claim petition, Claimant presented the deposition testimony of Dr. Maslow. Dr. Maslow first saw Claimant on February 20, 2001, upon referral by Dr. Hummer. Dr. Maslow reiterated the history of the work injury provided to him by Claimant. Dr. Maslow detailed the arthroscopic surgery he performed on Claimant's left knee on March 26, 2001, noting that he found a large piece of loose, cartilage material in the inner condyle or notch area, which damaged the major surface of the joint and resulted in pain for Claimant.

Dr. Maslow also observed evidence of a torn anterior cruciate ligament, torn meniscal cartilage and articular surface damage in multiple areas of Claimant's knee. Based upon this surgery and the history provided by Claimant, Dr. Maslow opined that all of his observations were causally related to Claimant's original work injury. Dr. Maslow also opined that Claimant's prognosis is poor, that he will have continuing problems with his knee and that he will very likely require joint replacement in the future. Further, Dr. Maslow opined that Claimant was restricted to very light-duty work with no kneeling or climbing and only limited lifting of twenty-five to thirty-five pounds on an occasional basis.

In opposition to Claimant's petition, Employer presented the deposition testimony of Claimant's supervisor, Mr. O'Shea. Mr. O'Shea described Claimant's original job duties as consisting of dismantling, inspection and reassembly of valves and a maxi-

mum lifting requirement of forty pounds. This job required occasional bending, climbing, pushing and pulling as well as constant standing.[7] Mr. O'Shea did not dispute the occurrence of Claimant's injury on January 22, 1999. He described the limited light-duty work Claimant performed following this injury and his subsequent return to full duty. Mr. O'Shea indicated that Claimant never made any complaints regarding difficulty performing his full-duty work.

With respect to his departure in late–1999, Mr. O'Shea indicated that Claimant advised him that he was leaving Employer for a better job which was managerial in nature. Specifically, Mr. O'Shea indicated that Claimant advised him that with this new job, he would supervise other people and would not perform any hands-on mechanical-type work. Mr. O'Shea testified that at the time Claimant left Employer, his position remained available to him and he was not forced to leave. As to Claimant's wages, Mr. O'Shea further testified that Claimant was paid at the rate of $15.00 per hour for a standard forty-hour work week, with no guaranteed overtime.

Ultimately, the WCJ issued a decision and order granting Claimant's claim petition and awarding him medical expenses and litigation costs. The WCJ did not award Claimant any wage loss benefits.

In this regard, the WCJ found that Claimant had left employment with Employer at his pre-injury wages for reasons unrelated to his work injury, i.e., better working conditions and increased wages.[8] Nevertheless, the WCJ found Claimant credible with respect to his average weekly wage calculation, i.e., $825.00 per week.[9]

■ Both Claimant and Employer appealed to the Board. Claimant alleged that the WCJ erred in concluding that he left his employment with Employer for reasons other than his work injury. Employer first filed a motion to quash alleging that Claimant's appeal to the Board was untimely as it was not filed within twenty days after notice of the WCJ's decision.[10] Employer next alleged that the WCJ erred in calculating Claimant's average weekly wage to be $825.00. The Board denied Employer's motion to quash, noting that the WCJ's decision was issued on April 30, 2002, and that Claimant's appeal envelope contained a United States postage paid metered stamp dated May 20, 2002, within the twenty-day appeal period. The Board affirmed the decision of the WCJ in all other respects. Claimant and Employer then filed cross-petitions for review with this Court.

■ On appeal,[11] Claimant argues that the WCJ and the Board erred as a matter

7. These job requirements appear to conflict with Claimant's work limitations as detailed by Dr. Maslow.

8. The WCJ accepted the testimony of Mr. O'Shea as credible with respect to Claimant's pre-injury job duties and the fact that Claimant's job remained available to him at the time he left Employer.

9. The WCJ also found Claimant credible as to the January 22, 1999, work incident and the fact that Claimant suffers ongoing symptoms related to this incident. The WCJ further accepted the testimony of Dr. Maslow as credible regarding his diagnosis and prognosis of

Claimant's condition, including Claimant's future physical limitations attributable to the original work-related injury. The WCJ noted that Dr. Maslow's testimony was supported by his clinical observations while performing the arthroscopic surgery on Claimant's left knee.

10. *See* Section 423(a) of the Pennsylvania Workers' Compensation Act (Act), Act of June 2, 1915, P.L. 736, *as amended*, 77 P.S. § 853.

11. Our scope of review in a workers' compensation appeal is limited to determining whether an error of law was committed, constitutional rights were violated, or whether

of law in concluding that he was not entitled to disability benefits because he voluntarily left Employer for reasons unrelated to his work injury. We agree with Claimant in part.[12]

■ The law is well settled that in a claim proceeding, the claimant bears the burden of establishing a right to compensation and of proving all elements necessary to support an award, including the duration of work-related disability. *Inglis House v. Workmen's Compensation Appeal Board (Reedy)*, 535 Pa. 135, 634 A.2d 592 (1993); *Innovative Spaces v. Workmen's Compensation Appeal Board (DeAngelis)*, 166 Pa.Cmwlth.141, 646 A.2d 51 (1994), *petition for allowance of appeal denied*, 541 Pa. 645, 663 A.2d 696 (1995).

In order to meet his burden in this case, Claimant testified on his own behalf. As to his reasons for leaving Employer, Claimant testified that his leg began to bother him when he resumed his full, preinjury duties in September of 1999. Specifically, Claimant indicated that he could not "physically do the requirements of the job, because [he] did not have good stability on [his] left leg when [he] was standing and working, especially off site." (R.R. at 19a). However, the WCJ rejected this portion of Claimant's testimony.

Instead, the WCJ found that Claimant left Employer to attain better working conditions, i.e., a managerial-type position with Langston, and increased wages. The WCJ appears to have based this finding on Claimant's cross-examination testimony, which was corroborated by the credible testimony of Mr. O'Shea. On cross-examination, Claimant indicated that he had applications with Langston well before he even started with Employer. Claimant also indicated that he would make more money at Langston and that the job at Langston was closer to home. Mr. O'Shea testified that Claimant had advised him he was leaving for a better job which was managerial in nature.

Nevertheless, our inquiry does not end here. Claimant testified as to his left knee surgery on March 26, 2001, the subsequent four months of physical therapy and his inability to return to any type of work during this period of time. Claimant also presented the testimony of his orthopedic surgeon, Dr. Maslow. Dr. Maslow detailed his findings with respect to this surgery and offered his opinion that said findings were causally related to Claimant's original work injury. Dr. Maslow also opined as to Claimant's future physical limitations which he related to this injury. As noted above, the WCJ accepted the testimony of Claimant with respect to his

necessary findings of fact are supported by substantial evidence. Section 704 of the Administrative Agency Law, 2 Pa.C.S. § 704. We acknowledge our Supreme Court's decision in *Leon E. Wintermyer, Inc. v. Workers' Compensation Appeal Board (Marlowe)*, 571 Pa. 189, 812 A.2d 478 (2002), wherein the Court held that "review for capricious disregard of material, competent evidence is an appropriate component of appellate consideration in every case in which such question is properly brought before the court." *Wintermyer*, 571 Pa. at 203, 812 A.2d at 487.

12. In his brief to this Court, Claimant alleged that the WCJ and the Board erred by failing to grant him various periods of partial and

total disability benefits subsequent to the time he left Employer, i.e., from November of 1999 and continuing. However, in his petition for review, Claimant only alleged an error with respect to his entitlement to such benefits for the time period beginning with his surgery on March 26, 2001, and continuing forward. The law is well settled that issues not raised in the petition for review are waived and will not be addressed by this Court. *Bond v. Workers' Compensation Appeal Board (Belmont Center)*, 711 A.2d 554 (Pa.Cmwlth.1998). Hence, Claimant has waived any issue with respect to his entitlement to benefits for the time period prior to March 26, 2001.

ongoing symptoms as well as the testimony of Dr. Maslow as credible and convincing.

Despite these credibility determinations, in his decision, the WCJ made no specific findings of fact regarding this causal connection or Claimant's potential entitlement to disability benefits for this period of time. Rather, it appears that the WCJ essentially held that the fact that Claimant left Employer in November of 1999 for non-work-related reasons forever precludes him from entitlement to benefits, be it partial or total disability benefits.[13]

We cannot entirely agree with the WCJ in this regard. Admittedly, we have previously indicated that an injured claimant who voluntary leaves a light-duty job with his employer in order to take another job with a different employer assumes the risks typically associated with such a decision, including the risk of a lay-off. *See Welsh v. Workmen's Compensation Appeal Board (L.W. Miller Roofing Co.)*, 686 A.2d 59 (Pa.Cmwlth.1996). In *Welsh*, the claimant left his employer for what he described as a job with another employer with better benefits and was subsequently laid off, similar to this case.

We held in *Welsh* that the claimant's loss of wages were the direct result of his resignation and not his original work injury, thereby precluding a reinstatement of his benefits.[14] Nevertheless, we did not hold that the claimant was forever precluded from a reinstatement of benefits. Instead, we noted the traditional burden with respect to reinstating benefits after suspension, i.e., demonstrating that the reasons for the suspension no longer exist by proving that, through no fault of his own, a claimant's earning power is once again adversely affected by his disability and that the disability which gave rise to his original claim continues. *Welsh, citing Pieper v. Ametek–Thermox Instruments Division*, 526 Pa. 25, 584 A.2d 301 (1990).

The case now before this Court presents a variation from the facts and holding in *Welsh*, i.e., here the Claimant appears to have had a loss of wages which could be directly attributable to his original work injury and not necessarily the sole result of his resignation from his original employer, at least for a brief period of approximately four months. The WCJ made no specific findings of fact with respect to Claimant's loss of wages or his potential entitlement to a reinstatement of benefits during this period of time.

We note that had Claimant maintained his employment with Employer and required surgery and subsequent treatment, thereby preventing him from working, Claimant would surely have been entitled to total disability benefits during such a period of time. Thus, to the extent that the order of the Board affirmed the decision and order of the WCJ denying Claimant disability benefits during the four-month period beginning with Claimant's knee surgery on March 26, 2001, the Board erred. The case must be remanded

---

**13.** By finding that Claimant was not entitled to any wage loss benefits following his voluntary departure from Employer for non-work-related reasons, the WCJ in essence held that Employer was entitled to a suspension of any such benefits at the time, i.e., although Claimant had ongoing symptoms resulting from the original work injury, he had no loss of wages attributable to that injury. The WCJ's decision appears to forever preclude Claimant from attempting to "reinstate" or seek entitlement to these benefits.

**14.** We noted in *Welsh* that the claimant did not contact his original employer about his former position or otherwise inquire as to job availability until approximately seventeen months after his resignation and approximately six months after he filed his reinstatement petition.

to the Board with the direction that it be further remanded to the WCJ for findings regarding this period.[15]

█ Employer argues on appeal that the WCJ and the Board erred in calculating Claimant's average weekly wage at $825.00 instead of $600.00. We disagree with Employer in this regard.

Employer places heavy emphasis on the fact that Claimant's claim petition alleges an average weekly wage of $600.00.[16] Admittedly, Claimant's claim petition does so provide. However, the Claimant was free to amend his petition as he essentially did before the WCJ, testifying that he worked for Employer forty hours per week at the rate of $15.00 per hour ($600.00 per week) plus a "minimum of ten hours overtime" per week at the rate of time-and-a-half ($22.50 per hour times ten hours or $225.00 per week), for a total average weekly wage of $825.00. (R.R. at 108a). The WCJ specifically accepted the testimony of Claimant as credible with respect to this issue. Thus, we cannot say that the WCJ or the Board erred in calculating Claimant's average weekly wage at $825.00.

Accordingly, the order of the Board, insofar as it affirmed the decision of the WCJ denying Claimant any wage loss benefits prior to March 26, 2001, and calculating Claimant's average weekly wage at $825.00, is affirmed. The order of the Board, insofar as it affirmed the decision of the WCJ denying Claimant any wage loss benefits beginning on March 26, 2001, and continuing for approximately four months thereafter, is reversed. The case is remanded to the WCJ for further findings consistent with this opinion.

## ORDER

AND NOW, this 7th day of January, 2004, the order of the Workers' Compensation Appeal Board (Board), insofar as it affirmed the decision of the Workers' Compensation Judge (WCJ), denying Michael Horne (Claimant) any wage loss benefits prior to March 26, 2001, and calculating Claimant's average weekly wage at $825.00, is affirmed. The order of the Board, insofar as it affirmed the decision of the WCJ denying Claimant any wage loss benefits beginning on March 26, 2001, and continuing for approximately four months thereafter, is reversed. The case is remanded to the Board, with specific instructions to remand the case to the WCJ, for further findings consistent with this opinion.

Jurisdiction relinquished.

█

---

15. As to Claimant's new position with Maola beginning in August of 2001 and his alleged entitlement to partial disability benefits, it appears that the Board properly affirmed the WCJ's decision denying Claimant any such benefits. The WCJ's decision in this regard is consistent with our prior holding in *Welsh*, i.e., Claimant's loss of earnings at that period of time remained the result of his voluntary decision to leave employment with Employer at his pre-injury wages.

16. For reasons that are not fully understood by this Court, Employer attempts to characterize Claimant's actions in stating an average weekly wage of $600.00 as the filing of misleading information with the intent to defraud. We disagree with this attempted characterization by Employer.