Lorna **VIRGO**, Petitioner

v.

**WORKERS' COMPENSATION APPEAL BOARD (COUNTY OF LEHIGH–CEDARBROOK), Respondent.**

Commonwealth Court of Pennsylvania.

Submitted on Briefs Nov. 18, 2005.

Decided Dec. 22, 2005.

---

Robert R. Pandaleon, Bethlehem, for petitioner.

Steven B. Loux, Allentown, for respondent.

BEFORE: PELLEGRINI, Judge, and FRIEDMAN, Judge, and McCLOSKEY, Senior Judge.

OPINION BY Judge PELLEGRINI.

Lorna Virgo (Claimant) appeals from an order of the Workers' Compensation Appeal Board (Board) affirming the decision of the Workers' Compensation Judge (WCJ) denying her reinstatement petition and granting the suspension petition filed by the County of Lehigh–Cedarbrook Nursing Home (Employer) based on a finding that any loss of earning power was the result of her discharge from employment due to "bad faith" in carrying out her job responsibilities.

Claimant began working for Employer on July 7, 2000, as a full-time certified nursing assistant. On November 12, 2002, Employer issued a Notice of Compensation Payable (NCP) accepting liability for a work-related right knee, right hip and low back sprain/strain injuries sustained by Claimant while lifting a patient on December 15, 2001. During the period between the injury and the time the NCP was issued, Claimant never stopped working for Employer, but her doctor eventually placed restrictions on her work activities, and she was placed in a light-duty position on December 18, 2002.

On January 2, 2003, Claimant was terminated due to her unsatisfactory work performance, having received two unsatisfactory annual performance evaluations. Alleging that she was not fully recovered from her work-related injuries on the day of her discharge because she was performing light-duty work, Claimant filed a petition seeking reinstatement of her benefits.

In response, Employer filed a petition alleging her benefits should be suspended because any wage loss was not due to any work-related injury, but due to her failure to carry out her work responsibilities in good faith as evidenced by two unsatisfactory annual performance evaluations.

Before the WCJ, after describing her job duties and the nature of her injuries, Claimant testified that Barbara Valentine (Valentine), Employer's Assistant Director of Nursing, informed her that she was being discharged because she had received two unsatisfactory annual performance evaluations. She stated that she disagreed with those evaluations because she felt that her "performance was great" and that the second evaluation was unfair because Employer failed to give her the type of work for which she was cleared to perform once she was placed on light-duty. Claimant acknowledged, however, that she repeatedly met with Valentine and her supervisors to discuss her unsatisfactory evaluations and overall job performance. She also testified that Employer went beyond the bounds of the restrictions because her work still involved heavy lifting and bending.

Valentine testified that she was responsible for overseeing the nursing units, the employees and resident care, that she reviewed all performance evaluations, and disciplined and terminated employees when necessary. Regarding performance evaluations, she testified that new employees received a 12–week evaluation, a six-month evaluation, and annual evaluations thereafter, with a probationary period of six months, and that Employer's policy mandated that an employee's receipt of two unsatisfactory annual evaluations resulted in termination of his or her employment. Regarding Claimant, Valentine tes-

tified that Claimant received a written warning for an incident occurring on December 19, 2000, when Claimant failed to follow her supervisor's specific instructions to attend to a resident who was not part of her scheduled assignment.[1] The warning was signed by Claimant and indicated that "progressive disciplinary action up to and including termination" could result from additional failures to follow Employer's instructions. On February 25, 2002, Claimant arrived late for work and refused to sign in for the exact time of her arrival as requested, resulting in Claimant being suspended from work for three days without pay.[2] On March 8, 2002, Claimant again was suspended from work, this time for 10 days because she had accumulated six episodes of sick days or late time during the preceding eight pay periods, the first of which dated back to November 1, 2001.[3] She testified that Claimant received an unsatisfactory score on her annual evaluation for the 2001 calendar year, specifically in areas of cooperation with others and initiative.[4] On June 8, 2002, Claimant was issued an unsatisfactory six-month re-evaluation due to poor performance in the areas of work quantity, attitude, cooperation with others and initiative.[5] On December 30, 2002, Claimant received an unsatisfactory annual evaluation for the 2002 calendar year for the same reasons as the June 2002 evaluation, with additional problems in the areas of ability to follow instructions and the lack of special effort.[6]

1. This warning was prepared by Susan Andreko, RN, and approved by Donna Kuhn, Director of Nursing II.

2. This suspension was prepared by Valentine, signed by her supervisor Andreko and approved by Mary Hazzard, Director of Nursing.

3. The suspension was prepared by Andreko, signed by Valentine as Supervisor and approved by Kuhn.

4. The rater was Donna Cerutsky and the reviewer was Jane Frey, both of whom signed the evaluation.

5. The rater and reviewer again were Cerutsky and Frey. Valentine testified that employees who received an unsatisfactory annual evaluation typically received a re-evaluation six months later.

6. This rater was Valentine and the reviewer's name is illegible. Specifically, this evaluation stated:
   *Ratings*
   "Slow; Must improve" in the context of "Work Quantity"
   "Somewhat indifferent" in the context of "Attitude"
   "Quarrelsome, Antagonistic" in the context of "Cooperation with Others"
   "Needs Prodding" in the context of "Initiative"
   "Needs repeated Instruction" in the context of "Ability to Follow Instructions"
   "Reluctantly" in the context of "Special Effort"
   *Comments* "Lorna fails to follow Cedarbrook's policies and procedures such as the policy for breaks and lunch periods. Lorna was observed by her Charge Nurse talking to staff members, [sic] in the D7 Kitchen area and reading. Lorna then left the kitchen area for her lunch break of one-half hour. The total time Lorna took from work was 45 minutes. Lorna refused redirection from her Charge Nurse and stated that she would 'keep a list of other employees' behaviors to report', [sic] rather than accepting the constructive candor."
   "Lorna has also failed to follow the policy and procedures for cell phone use during work time. When she is redirected by her Charge Nurse, she becomes quarrelsome...."
   "Lorna's initiative and work quantity remains unsatisfactory. She often needs prodding and does require repeated redirection with the following tasks: vital signs, flow book completion, resident weights, and cleaning the utility rooms and kitchen. Lorna continues to be non-productive when her tasks are complete. She fails to offer assistance to peers."
   "Lorna fails to take responsibility for her own actions and continues to undermine the team effort necessary to complete the

Valentine testified that she met with Claimant and Claimant's supervisor to discuss the 12–week unsatisfactory evaluation and extended Claimant's probationary period as a new employee because her six-month evaluation was unsatisfactory. When Claimant received her second unsatisfactory evaluation, she testified that she met with Claimant to inform her of the termination and the reasons for the unsatisfactory rating. Lastly, Valentine testified as to the meaning of the categories used on the evaluations, as well as the particular weaknesses she felt were the causal factors in Claimant's unsatisfactory scores. Without objection all of the evaluation reports were entered into evidence.

■ The WCJ denied Claimant's reinstatement petition finding that at the time of her termination on January 2, 2003, Claimant continued to have ongoing symptoms and limitations from her work injury, and that the disciplinary policy and procedures and Claimant's on-the-job conduct were the reasons for her termination. The WCJ determined that Claimant's discharge was not related to her work injury, but was related to her conduct at work, and that Claimant's loss of earnings was the result of her misconduct. Because it was stipulated that when Claimant was discharged she was working without a loss of earnings, the Employer's suspension petition was granted.[7] On appeal to the Board, Claimant argued that the WCJ erred in denying her reinstatement petition because an unsatisfactory annual evaluation standing alone, without a specific event of wrongful conduct, could not merit allocation of fault to Claimant for her firing. The Board affirmed the WCJ's order and this appeal followed.[8]

Claimant contends that Employer failed to make out its burden that she was terminated because of her wrongful conduct on the job, to which Employer initially responds that it was not its burden but Claimant's to show that her discharge was not her fault, and, in any event, it established that any loss of her power was a result of her own conduct. The issue of who had the burden of proof in a reinstatement petition became somewhat murky as a result of our Supreme Court decision in *Pieper v. Ametek–Thermox Instruments Division v. Workmen's Compensation Appeal Board*, 526 Pa. 25, 34, 584 A.2d 301, 305 (1990), where it articulated the standard that in order to succeed on a reinstatement petition, claimants bear the burden of demonstrating that through no fault of their own,[9] their earning power is once

resident's . . . care. Lorna continues to be quarrelsome and antagonistic with peers." "Lorna does not function as a team member."

7. Employer also filed a termination petition alleging that Claimant was fully recovered from her work injuries as of February 4, 2003, but this was denied by the WCJ and is not an issue in this appeal.

8. Our scope of review of the Board's decision is limited to determining whether an error of law was committed, whether necessary findings of fact are supported by substantial evidence, or whether constitutional rights were violated. *Sheridan v. Workmen's Compensation Appeal Board (Anzon)*, 713 A.2d 182 (Pa. Cmwlth.1998).

9. This area became even murkier when the *Pieper* standard requiring a finding of "fault" was called into question by *Hertz–Penske Truck Leasing Co. v. Workmen's Compensation Appeal Board (Bowers)*, 546 Pa. 257, 684 A.2d 547 (1996). *Hertz–Penske* held that a discharge for non-willful misconduct or because of business necessity did not preclude suspension of benefits of a still-disabled claimant. However, in *Vista International Hotel v. Workmen's Compensation Appeal Board (Daniels)*, 560 Pa. 12, 742 A.2d 649, 656 (1999), our Supreme Court clarified its holding stating, "*Hertz–Penske* does not stand for the proposition . . . that fault is never relevant in a workers' compensation proceeding. Rather, it holds that fault is not generally relevant to the initial assessment of whether the claimant's

again adversely affected by their disability, and the disability which gave rise to their original claim, in fact, continues. Under that *Pieper* standard, it could be inferred, as does Employer here, that a claimant had the burden of establishing that the discharge was not a result of his or her misconduct. In other words, any discharge would be presumed to be the fault of the claimant unless the claimant proved otherwise. However, consistent with the principle that an affirmative defense is always the burden of the party asserting it, in *Stevens v. Workers' Compensation Appeal Board (Consolidation Coal Co.)*, 563 Pa. 297, 760 A.2d 369, 377 (2000), our Supreme Court clarified the *Pieper* standard holding that to find that a claimant failed to established that the discharge was through no fault of his or her own, an employer must demonstrate "that suitable work was available or would have been available but for circumstances which merit allocation of the consequences of the discharge to the claimant, such as claimant's lack of good faith." *Id.* at 297, 760 A.2d 369, 377 (2000); *Cryder v. Workers' Compensation Appeal Board (National City)*, 828 A.2d 1155, 1159 (Pa.Cmwlth. 2003), *petition for allowance of appeal denied*, 577 Pa. 726, 847 A.2d 1289 (2004).

■ No matter how the burden shifts or who has the burden in a reinstatement petition, in this case, Employer always had the burden of establishing "lack of good faith" because there never had been a formal suspension of Claimant's benefits. In *Pappans Family Restaurant v. Workmen's Compensation Appeal Board (Ganoe)*, 729 A.2d 661, 665 (1999), a claimant went back to work, albeit at a different employer, with no loss of wages. After being let go by the second employer,

claimant filed a reinstatement petition and we addressed who had the burden of establishing the "allocation of the consequences of discharge" stating:

Our first inquiry is to determine what the proper burden of proof is and who bears that burden. Normally, a claimant seeking reinstatement of his benefits bears the burden of establishing (1) that through no fault of his own, his earning power has again been affected by a work-related injury and (2) that the disability which gave rise to his original claim continues. *Pieper v. Ametek–Thermox Instruments Division*, 526 Pa. 25, 584 A.2d 301 (1990). That analysis, which places the initial burden on the claimant, however, applies to a claimant who is seeking to have his benefits reinstated following suspension. A suspension of benefits is a suspension of an employer's obligation to pay benefits because, although the claimant may still suffer from a medical disability, there is currently no loss of earnings, i.e., no disability for purposes of the Act, attributable to the work-related injury. *Pieper.*

In the present case, there had never been a suspension, either by a supplemental agreement, order or otherwise. It is well settled, of course, that, once established, disability is presumed to continue until proven otherwise. In this case, Employer has not established by affirmative proof that, during any relevant period, it was entitled to cease paying benefits or that Claimant's disability had ended; indeed, the record is clear that during all relevant times, Claimant remained under the restriction that he could only work 40 hours per week and not lift more than 50 pounds. Accord-

burden of establishing a loss of earnings capacity attributable to a work-related injury

has been satisfied."

ingly, the *Pieper* analysis is not specifically applicable here.

Because Claimant's disability is presumed to continue, it was the Employer who had the burden to establish either: (1) that there was work available within the claimant's restrictions; or (2) that the claimant's disability was caused by something other than his work-related injury. (Footnote and citations omitted.)

The question then is what is "lack of good faith," i.e., "bad faith" on the part of a claimant, so as to allocate the consequences of his or her discharge to him or her. Claimant, here, contends that for there to be "bad faith," Employer has to show a specific act that is tantamount to willful misconduct, suggesting a standard much like what is used to determine whether a claimant is entitled to unemployment compensation benefits.

■ While if an employer makes out willful misconduct that would be sufficient to deny unemployment compensation benefits, justify a suspension and preclude the reinstatement of benefits, *Cryder,* the stricter willful misconduct standard is not the standard to determine "bad faith" in the context allocating fault in a workers' compensation case. *Pappans Family Restaurant.* Nonetheless, some "bad faith" willful misconduct on the part of the claimant that caused the discharge has to be established or benefits will not be suspended or will be reinstated. If, for example, a claimant receives unsatisfactory performance evaluations based solely on an inability to perform despite good faith efforts to do so, bad faith on the part of the claimant has not been made out. *Cryder; see also B B Drywall, Inc. v. Workers' Compensation Appeal Board (Griffo),* 784 A.2d 250 (Pa.Cmwlth.2001). Simply put, to make out "bad faith" or "fault on the part of a discharged claimant," if an employer only

shows that he or she "would if he or she could," then "bad faith" is not shown and benefits should continue or be reinstated; but if an employer establishes that the claimant "could if he or she would, and didn't," "bad faith" is established and a claimant is not entitled to continuing benefits.

■ Even if there does not have to be a specific incident of misconduct to allocate fault to her, Claimant then contends that there is not substantial evidence to grant a suspension or deny reinstatement. She argues that her unsatisfactory evaluations, the reason that she was terminated, were largely based on subjective observations by her superiors, and she was not given a fair opportunity to establish that her discharge was not the result of her bad faith because they were too vague to rebut. Claimant is plainly incorrect, however, that there were no specific instances of wrongful conduct demonstrated by Employer. Assuming that her performance evaluations and notice of suspensions are not inadmissible hearsay, her annual performance evaluation indicates that Claimant failed to follow specific instructions at work, took longer than permitted lunch breaks, used her cell phone while on-duty, argued with co-workers, and failed to offer them assistance when needed. The written warning of December 29, 2000, was in response to a specific instance of misconduct, and Claimant was even informed in connection therewith that termination could follow as a result of failing to follow Employer's instructions. Additionally, specific instances of failure to follow instructions and tardiness were described in the two suspensions issued to Claimant in 2002. Because Employer's policy is to terminate employees who receive two annual evaluations with unsatisfactory scores, and the foregoing instances of wrongful conduct were substantial factors leading to

her unsatisfactory evaluation scores, it is clear that Claimant "could if she would," making Claimant's discharge her fault due to her conduct.

Even if the reasons for her discharge were otherwise substantial evidence, Claimant contends that they should not be considered because her performance evaluations and disciplinary records were hearsay as Valentine had no first-hand knowledge of the alleged unsatisfactory conduct making her testimony and the records impermissible hearsay. Employer contends that the records were not inadmissible because those records fall within the "business record exception" to the hearsay rule set forth in Section 6108(b) of the Uniform Business Records Act, 42 Pa.C.S. § 6108(b), which provides:

> (b) General Rule.—A record of an act, condition or event shall, insofar as relevant, be competent evidence if the custodian or other qualified witness testifies to its identity and the mode of its preparation, and if it was made in the regular course of business at or near the time of the act, condition or event, and if, in the opinion of the tribunal, the sources of information, method and time of preparation were such as to justify its admission.[10]

The purpose of this provision was to create an additional exception to the hearsay rule in circumstances where a record of an act, a condition or an event

was made in the regular course of business, at or near the time of the act, condition or event, and where the sources of information, method and time of preparation were such as to justify its admission. *Boyle v. Steiman*, 429 Pa.Super. 1, 631 A.2d 1025 (1993). Normally, whether a document should be admitted under the business records exception to the hearsay rule is within the discretion of the WCJ provided that it is exercised within the dictates of Section 6108, and this type of evidentiary ruling may only be reversed on appeal if an error of law was committed or there was a clear abuse of discretion. *Toth v. Workmen's Compensation Appeal Board* (USX Corp.), 737 A.2d 838 (Pa. Cmwlth.1999). Under this exception, it is not essential to produce either the person who made the entries or the custodian of the record at the time the entries were made or that the witness qualifying the business records even has personal knowledge of the facts reported in the business record. *In re Indyk's Estate*, 488 Pa. 567, 413 A.2d 371 (1979); *Wayne County Bd. of Assessment v. Federation of Jewish Philanthropies*, 43 Pa.Cmwlth. 508, 403 A.2d 613 (1979). As long as the authenticating witness can provide sufficient information relating to the preparation and maintenance of the records to justify a presumption of trustworthiness of the business records of a company, a sufficient basis is provided to offset the hearsay character of the evidence. *In re Indyk's Estate.* How-

---

10. While not applicable to administrative agencies, Pa. Rule of Evidence 101, the Pennsylvania Rule of Evidence, contains a similar provision. Pa. Rules of Evidence Rule 803 provides:

> The following statements, as hereinafter defined, are not excluded by the hearsay rule, even though the declarant is available as a witness:
>
> * * *
>
> (6) Records of regularly conducted activity. A memorandum, report, record, or data

compilation, in any form, of acts, events, or conditions, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, ... unless the sources of information or other circumstances indicate lack of trustworthiness....

ever, a record in the nature of an expert opinion, diagnosis or one that contains conclusions or impressions are not admissible as a business record unless the person who rendered the opinion is available for cross-examination. *Commonwealth v. Raab*, 845 A.2d 874 (Pa.Super.), *petition for allowance of appeal granted*, 580 Pa. 696, 860 A.2d 123 (2004); *Toth.*

■ While there are some impressions and conclusions contained in the annual reports and performance evaluations that should have been excluded because the person who rendered them was not available for cross-examination, Claimant waived any argument that those documents should not have been admitted because Claimant's counsel stated he had "no objection" to their admission. *City of Philadelphia v. Petherbridge*, 781 A.2d 263 (Pa.Cmwlth.2001); *Commonwealth. v. Foreman*, 797 A.2d 1005 (Pa.Super.2002). Because they were admitted without objection, they fall within the business record exception and constitute substantial evidence to support a finding that Claimant's discharge was the result of her "bad faith."

Accordingly, the order of the Board is affirmed.

### ORDER

AND NOW, this *22nd* day of *December,* 2005, the order of the Workers' Compensation Appeal Board, No. A04–1619, is affirmed.