# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Franklin Montano,                           :
                                            :
                        Petitioner          :
                                            :
            v.                              :    No. 732 C.D. 2021
                                            :    Submitted:  December 17, 2021
Advance Stores Company, Inc.                :
t/a Advance Auto Parts                      :
(Workers' Compensation                      :
Appeal Board),                              :
                                            :
                        Respondent          :


BEFORE:    HONORABLE PATRICIA A. McCULLOUGH, Judge
           HONORABLE MICHAEL H. WOJCIK, Judge
           HONORABLE ELLEN CEISLER, Judge


OPINION BY JUDGE WOJCIK                          FILED:  June 27, 2022


            Franklin Montano (Claimant) petitions for review of the Order of the
Workers' Compensation Appeal Board (Board) affirming the Decision and Order of
a workers' compensation judge (WCJ) that denied Claimant's Petition to Reinstate
Compensation Benefits (Reinstatement Petition) pursuant to the provisions of the
Workers' Compensation Act (Act).[1]  We affirm.

            On May 30, 2017, Claimant sustained injuries to his back and right
shoulder when boxes of windshield washer fluid fell on him while in the course and
scope of his employment as a general laborer in the warehouse of Advance Stores
Company, Inc. t/a Advance Auto Parts (Employer).  On June 13, 2017, Claimant

---

[1] Act of June 2, 1915, P.L. 736, *as amended*, 77 P.S. §§1-1041.4; 2501-2710.

returned to work in a modified-duty position as a trainer with Employer. On September 19, 2017, Employer issued a medical-only Notice of Compensation Payable (NCP) for a work-related injury of an upper back area strain/tear with noted right shoulder pain. On August 13, 2018, Claimant was discharged from his employment with Employer based on his job performance as a trainer. That same day, Claimant filed the Reinstatement Petition seeking the reinstatement of temporary total disability (TTD) benefits for his work-related injuries because he was "terminated while on modified duty because of work injury related medical restrictions." Certified Record (CR) Docket Entry 2 at 1.

While the Reinstatement Petition was pending, on September 12, 2018, Sagi Kuznits, M.D., performed a microdiscectomy to treat a right L4-5 disc herniation in Claimant's back. On June 14, 2019, Todd Chertow, M.D. performed a right shoulder manipulation under anesthesia; lysis of adhesions; debridement of intra-articular sided tear of the rotator cuff; superior labral debridement; debridement of the subacromial space; and subacromial decompression to treat Claimant's right shoulder adhesive capsulitis; partial thickness joint-side rotator cuff tear; labral tear; and adhesions. Both Dr. Kuznits and Dr. Chertow related Claimant's diagnoses and treatment to his May 30, 2017 work-related injuries.

Employer's medical expert, Amir Fayyazi, M.D. concurred with Dr. Kuznits' opinion that Claimant sustained an L4-5 disc herniation work-related injury. However, Dr. Fayyazi opined that Claimant may have only suffered a right shoulder sprain and strain from which Claimant had fully recovered at the time of his examinations on March 13, 2019, and October 16, 2019.

Following hearings, on June 17, 2020, the WCJ issued a Decision and Order disposing of the Reinstatement Petition in which he explained:

2

19. Counsel essentially agreed that the medical issues were not the primary disputed issue. That was why much of the medical evidence was offered by reports and records despite alleged disability exceeding 52 weeks. The medical issue in this matter is Claimant's work restriction status during this litigation. All doctors (Kuznits, Chertow, and Fayyazi) essentially agreed that Claimant suffered low back and shoulder injuries, although the exact diagnoses were at variance and from which Claimant had not fully recovered, but he was capable of working. All agreed that, following the September 12, 2018 back surgery and the June 14, 2019 shoulder surgery, Claimant would have a period of total disability from all work. However, Dr. Fayyazi credibly explained that when he saw Claimant on March 13, 2019, (six months after the back surgery), and October 16, 2019, (four months post-shoulder surgery), Claimant was capable of performing light-duty work (which I find to be within the job duties that he had as a trainer, as credibly described by [Employer's head trainer, Genoveva] Ramos). . . . I do find the opinions of Claimant's treating physicians more credible on diagnoses as they treated and performed surgeries. Otherwise, I find Dr. Fayyazi's releases to light-duty work during each of his examinations to be largely unchallenged and credible.

Reproduced Record (RR) at 10a.

Rather, the primary disputed issue in the hearings before the WCJ was the cause of the termination of Claimant's employment. As noted above, in the Reinstatement Petition, Claimant alleged that he was terminated "because of work injury related medical restrictions." CR Docket Entry 2 at 1. At the WCJ's hearings, Claimant testified that when he returned to work following his injuries, he was assigned to train other employees in his modified-duty training position and that his supervisor was Ms. Ramos. He stated that he was never disciplined during the eight years that he worked for Employer, and that when there was an issue with his paperwork, Ms. Ramos pointed it out and had him correct it. Claimant testified that

3

at no time did Ms. Ramos indicate that she thought that he was falsifying the training forms. He stated that when he was fired on August 13, 2018, he reviewed the correction report containing that allegation, but he refused to sign it because he did not agree with it. He testified that he already suspected that he would be fired when he was called to the office that day because Employer's new manager was routinely firing employees. Claimant stated that he believed that the real reason for his termination was because he was speaking with Mario, a union representative, about signing up for a union organization three days prior to his termination. He testified that he pursued a union grievance related to his discharge, but he was not reinstated.

In contrast, Ms. Ramos testified by deposition that she was the head trainer at Employer's auto parts distribution center, and that she is responsible for scheduling the trainers; overseeing the training; ensuring that the trainers complete the training classes; and making sure that the training paperwork was properly completed. She stated that she was Claimant's "go-to" trainer, making sure that he trained employees correctly. She testified that she had personally trained Claimant in several areas and that he underwent additional training to learn how to train other employees on various pieces of equipment. Ms. Ramos stated that when Claimant was assigned to light-duty status after his injuries, he performed more training re-certification during which he observed other employees who were being trained. RR at 224a-26a.

Ms. Ramos testified that on August 9, 2018, she sent her supervisor an email, advising the supervisor that Claimant was not completing his paperwork correctly, and that she was concerned that this could later result in a failed safety audit. She stated that she reviewed various training forms that Claimant had completed, and highlighted instances where he had documented that training had

4

been completed, but the equipment being used for the training did not have the functions that were indicated on the forms. She testified that this demonstrated that Claimant was moving through the training without regard to actually training or reviewing the specific items indicated on the forms. Ms. Ramos stated that she had informally counseled Claimant on numerous occasions and that she officially counseled him two times on this subject. RR at 230a-40a, 244a-46a, 264a-74a.

Ms. Ramos testified that Employer had a progressive discipline program under which employees are to first receive a verbal warning, and then a written warning, before action is taken. She stated that she did not have any evidence of either verbal or written warnings before Claimant's employment was terminated on August 13, 2018. She testified that she was not involved in the disciplinary action. She stated that she was aware that there was a unionization effort in Employer's distribution center around the time of Claimant's termination. RR at 247a-50a, 252a.[2]

---

[2] Employer also submitted the August 13, 2018 Team Member Correction Report (Report) underlying Claimant's termination that was executed by Employer's Manager, Matthew Walters. *See* RR at 275a. Claimant identified the Report as the document that was presented to him at the meeting with Mr. Walters prior to his termination, and which he refused to sign. *Id.* at 75a. The Report was admitted into evidence as a business record without objection as Employer's Exhibit D-1. *See id.* at 76a, 155a-56a. The Report states, in relevant part:

> [Claimant] is a certified DC trainer and as a DC trainer, our Team Members and the DC depends on his skill set to help drive our Safety Culture. When [Claimant] accepted the role, it was expected of him to ensure that all team members are trained accurately and all paperwork was completed accurately and on time.

> [Claimant], on several occasions it was brought to our attention that you were submitting Safety Documentation [that was] incomplete. We sat down with you and provided you with feedback, [and] when it happened again, we sat down with you for a second time and

**(Footnote continued on next page…)**

5

With respect to the foregoing testimony, the WCJ made the following determinations:

> 17. I find Claimant's testimony concerning his work injury, physical condition, symptomology, and treatment course, including his low back surgery and right shoulder surgery, competent and credible. I do not find credible his testimony that he was discharged from his job because of his work injury fifteen months earlier or his interaction with union organization efforts. His discharge occurred well more than a year after his injury, during which time Employer consistently accommodated his work restrictions, and he continued to perform meaningful and

---

provided you with feedback as well as provide you with samples on how the forms were to be completed.

During these conversations, it was brought to your attention several times that you are responsible for completing the information accurately. If the documents are not accurate and[/]or incomplete our DC is not in compliance and it shows that we don't care for our Team Members' Safety and Development.

After several conversations, you continued to submit incomplete paperwork and signed off that they were done. This is falsifying information. As you know all [Employer] equipment operators need to carry proof of certification in order to operate the equipment they are certified on. Improper or incomplete training documents prevent compliance and that creates an eminent level safety violation. Submitting signed, incomplete training documents is also falsification of company documents. As a result, [Claimant's] employment with [Employer] is hereby terminated.

*Id.* at 275a. The WCJ found this document to be credible. *See id.* at 8a; *see also Virgo v. Workers' Compensation Appeal Board (County of Lehigh-Cedarbrook)*, 890 A.2d 13, 20 (Pa. Cmwlth. 2005) ("Under th[e business record] exception, it is not essential to produce either the person who made the entries or the custodian of the record at the time the entries were made or that the witness qualifying the business records even has personal knowledge of the facts reported in the business record.") (citation omitted); *id.* at 21 ("Because the [documents] were admitted without objection, they fall within the business record exception and constitute substantial evidence to support a finding that Claimant's discharge was the result of her 'bad faith.'").

6

necessary work, training other individuals; Ms. Ramos corroborated this testimony. His firing was not pretextual. His suggestion that he was discharged for possible unionization activities was speculation and, if true, which I find that it was not, it would have been unrelated to his work injury.

18. I find the testimony of Ms. Ramos competent and credible that she had legitimate concerns about Claimant's performance as a trainer, which she conveyed to him, and eventually to her superiors, out of her concern for the training records' integrity. She counseled Claimant before reporting him up the chain. Her account was corroborated by the documentation, which she explained, that supported Employer's justification for Claimant's discharge. (Since she was not involved with his termination, she would have had no need to see his human resources file.) Whether one considers it "falsification" or carelessness, the effect on Employer's operation was the same. Claimant was not fulfilling his required tasks, and adverse consequences could ensue (either audit failure or lack of safety due to incomplete training). I find that there were legitimate performance reasons, unrelated to Claimant's earlier work injury, for his August 13, 2018 discharge from employment. Both Claimant and Ms. Ramos confirmed that he would have continued to work had he not been fired.

RR at 9a-10a.

Ultimately, based on all of the evidence presented, the WCJ found the following relevant facts. On May 30, 2017, Claimant suffered a work-related right L4-5 disc herniation, resulting in the September 12, 2018 microdiscectomy and decompression procedure, and from which he is not fully recovered. Claimant also suffered a work-related right shoulder partial thickness joint-sided rotator cuff tear and labral tear, causing adhesions and adhesive capsulitis, resulting in the June 14, 2019 surgery, including manipulation under anesthesia; lysis of adhesions; debridement of intra-articular-sided tear of the rotator cuff; labral debridement;

7

debridement of the subacromial space; and subacromial decompression, from which he is not fully recovered. Because his post-injury wages did not equal or exceed his pre-injury wages, Claimant was partially disabled after his May 30, 2017 work-related injuries. As a result, he is entitled to temporary partial disability (TPD) benefits between May 30, 2017, and August 13, 2018, the date on which he was discharged for reasons unrelated to his work-related injuries when modified-duty work was available to him. Because Claimant was still under work restrictions when he was terminated, the WCJ awarded TPD benefits from August 14, 2018, to September 11, 2018, as well. RR at 11a.

The WCJ found that Claimant was totally disabled from September 12, 2018, to March 12, 2019, due to his work-related back surgery after which he was capable of performing the light-duty job for Employer from which he was legitimately discharged. As a result, he was entitled to TTD benefits for that period of time. Because Claimant could have performed light-duty work but for his earlier discharge from employment, the WCJ awarded TPD benefits from March 13, 2019, to June 13, 2019. RR at 11a.

The WCJ found that Claimant was totally disabled from June 14, 2019, to October 15, 2019, due to his work-related shoulder surgery after which he was again capable of performing the light-duty job for Employer from which he was legitimately discharged. As a result, he was entitled to TTD benefits for that period of time. Because Claimant could have resumed performing the light-duty work but for his earlier discharge from employment, and continuing thereafter, he is entitled to TPD benefits from October 16, 2019, and continuing, until changed in accordance with the provisions of the Act. RR at 11a-12a. Based on the foregoing, the WCJ issued an order granting Claimant's Reinstatement Petition, which the WCJ treated

8

as a claim petition for burden of proof purposes, and awarded the TPD and TTD benefits as outlined above. *See id.* at 14a.

Claimant appealed the WCJ's Decision and Order to the Board, arguing that the WCJ erred in failing to award total disability benefits following the termination of his employment by concluding that he was terminated for reasons unrelated to his work-related injuries, and because Employer failed to follow its progressive disciplinary policy prior to his termination. However, the Board rejected Claimant's first claim of error, observing:

> The WCJ concluded that [Employer] met its burden of showing that Claimant's loss of earnings was caused by a termination for cause and that it was unrelated to his work injury. Specifically, the WCJ accepted Ms. Ramos's testimony that Claimant had a pattern of incorrectly filling out training forms, which he had been warned about [] multiple times, which ultimately led to his termination from [Employer]. The WCJ also made findings that the termination, which occurred 15 months after his work injury, was not in any way related to his work injury or restrictions he continued to have for that work injury. Consequently, the substantial, competent evidence of record supports th[e] WCJ's conclusion that [Employer] met its burden of showing that Claimant's termination proved that his current earnings loss was not related to his work injury and amounted to a lack of good faith. Thus, the WCJ properly did not order [Employer] to pay total disability benefits after the termination.

RR at 22a-23a.

Finally, the Board also rejected Claimant's second claim of error, explaining:

> [T]here was no evidence submitted that [Employer] specifically violated any of its discipline policies, as Ms. Ramos was unaware whether Claimant had received any written warnings before being terminated, although [she]

9

testified he had received numerous verbal warnings. We note [Employer's] burden was only to prove Claimant's termination was not caused by the disability arising from the work-related injury and amounted to a lack of good faith, which it established through Claimant's for cause termination for a pattern of erroneously filling out paperwork.

RR at 23a (footnote omitted). Accordingly, the Board issued the Order affirming the WCJ's Decision and Order, and Claimant filed the instant petition for review.[3]

On appeal, Claimant contends that the Board erred in affirming the WCJ's Decision and Order, and Claimant's TTD payments should be reinstated, because: (1) there was no testimony establishing that Claimant was terminated for "bad faith" willful misconduct; (2) the WCJ sustained Claimant's hearsay objection to Ms. Ramos's testimony regarding the basis for his termination so it is not competent evidence, and her testimony was not credible[4]; (3) Employer failed to

---

[3] Our review in workers' compensation proceedings is limited to determining whether constitutional rights have been violated, whether an error of law has been committed, and whether necessary findings of fact are supported by substantial evidence. *Volterano v. Workmen's Compensation Appeal Board (Travelers Insurance Company)*, 639 A.2d 453, 455-56 (Pa. 1994).

[4] As this Court has explained:

> Substantial evidence is such relevant evidence as a reasonable person might accept as adequate to support a conclusion. In performing a substantial evidence analysis, this Court must view the evidence in a light most favorable to the party [that] prevailed before the factfinder. Moreover, we are to draw all reasonable inferences which are deducible from the evidence in support of the factfinder's decision in favor of that prevailing party. Furthermore, in a substantial evidence analysis where both parties present evidence, it does not matter that there is evidence in the record which supports a factual finding contrary to that made by the WCJ; rather, the pertinent inquiry is whether there is *any* evidence which supports the WCJ's factual finding. It is solely for the WCJ, as the factfinder, to assess credibility and to resolve conflicts in the evidence. In

**(Footnote continued on next page…)**

carry its burden of proving some "bad faith" willful misconduct on Claimant's part; and (4) Employer failed to follow its progressive discipline policy in terminating Claimant.

Relevant to our disposition of these claims, the Pennsylvania Supreme Court has explained:

> Where a claimant establishes that a work-related injury prevents a return to the time-of-injury job, a loss of earnings capacity is established. Once such a loss has been demonstrated, the claimant should generally be entitled to benefits, unless the employer can demonstrate that employment is available within the claimant's restrictions. Consistent with the purposes of the Act, as well as our decisional law and the decisions of the Commonwealth Court, as a general rule, where a work-related disability is established, a post-injury involuntary discharge should be considered in connection with the separate determination of job availability rather than as dispositive of loss of earnings capacity.
>
> [U]nder this approach, a partially disabled employee who, by act of bad faith, forfeits his employment would not be eligible for total disability benefits, as suitable employment was in fact available but for the employee's own wrongful conduct. Conversely, a partially disabled employee who acts in good faith to undertake work with restrictions would not be deprived of benefits that he plainly would have received had no light duty employment

---

addition, it is solely for the WCJ, as the factfinder, to determine what weight to give to any evidence. As such, the WCJ may reject the testimony of any witness in whole or in part, even if that testimony is uncontradicted.

*Sharkey v. Workers' Compensation Appeal Board (Federal Express)*, 786 A.2d 1035, 1038 (Pa. Cmwlth. 2001) (citation omitted and emphasis added). Accordingly, we will not accede to Claimant's request to review the WCJ's credibility determinations or to make additional findings based on assertions in his appellate brief.

been offered merely because the employer subsequently elects to terminate such employment.

> In summary, we hold that a claimant who has established a partial disability due to a work-related injury should generally continue to receive partial disability benefits by virtue of his loss in earnings capacity, even though subsequently discharged from employment, because the loss in earnings capacity remains extant. Whether the same claimant may receive total disability benefits depends upon whether the employer can demonstrate that suitable work was available or would have been available but for circumstances which merit allocation of the consequences of the discharge to the claimant, such as claimant's lack of good faith.

*Vista International Hotel v. Workmen's Compensation Appeal Board (Daniels)*, 742 A.2d 649, 657-58 (Pa. 1999) (citations and footnotes omitted). An employer can establish a lack of good faith, or bad faith, when the employer proves that it discharged the claimant for misconduct. *Sauer v. Workers' Compensation Appeal Board (Verizon Pennsylvania, Inc.)*, 26 A.3d 531, 536 (Pa. Cmwlth. 2011). Whether a claimant acted in bad faith, for purposes of a post-injury discharge, is a finding of fact for the WCJ. *Champion v. Workers' Compensation Appeal Board (Glasgow, Inc.)*, 753 A.2d 337, 340 (Pa. Cmwlth. 2000).

Even if it is assumed, as Claimant alleges, that Ms. Ramos's testimony is not competent and substantial evidence to prove that he was discharged for bad faith, as outlined above, the Report was admitted into evidence as a business record without objection. *See* RR at 76a, 155a-56a. The Report specifically outlines the bases for Claimant's termination, *i.e.*, that he continued to "submit incomplete paperwork and signed off that they were done," "[a]fter several conversations," thereby "falsifying information," and that "[s]ubmitting signed, incomplete training documents is also falsification of company documents." *Id.* at 275a. In addition,

the WCJ found the Report to be credible evidence. *See id.* at 8a. As a result, the Report constitutes substantial competent evidence supporting the WCJ's finding of bad faith on Claimant's part underlying the termination of his employment with Employer. *See Virgo*, 890 A.2d at 21 ("Because the[ documents] were admitted without objection, they fall within the business record exception and constitute substantial evidence to support a finding that Claimant's discharge was the result of her 'bad faith.'").

Moreover, Employer's purported failure to follow its progressive discipline policy does not compel the award of TTD benefits because it in no way affects the WCJ's finding of bad faith on Claimant's part. Indeed, as the Supreme Court has explained:

> The issue is whether, through no fault of the claimant, the injury has again [a]ffected claimant's earning ability. This issue is not one of misconduct akin to that found in the unemployment benefits setting; it is a question centering solely on whether the claimant's injury is again affecting his ability to earn. An award of unemployment compensation benefits, on the other hand, turns on a question of "willful misconduct," *i.e.*, on the presence or absence of a defined level or degree of misconduct. The conduct standards are therefore quite different in the two settings. Or, more strictly stated, in the [workers'] compensation arena, there is no conduct standard as such.

*Bortz v. Workmen's Compensation Appeal Board (Reznor Division of FL Industries)*, 683 A.2d 259, 262 (Pa. 1996) (citations omitted). *See also Vista International Hotel*, 742 A.2d at 657 ("[U]nder this approach, a partially disabled employee who, by act of bad faith, forfeits his employment would not be eligible for total disability benefits, as suitable employment was in fact available but for the employee's own wrongful conduct.").

Thus, as the Board correctly determined:

13

> We note that Claimant cites to two unemployment compensation cases, *Cipriani v.* [*Unemployment Compensation Board of Review*], 466 A.2d 1102 (Pa. Cmwlth. 1983), and *Brady v.* [*Unemployment Compensation Board of Review*], 544 A.2d 1085, 1086 (Pa. Cmwlth. 1988), for the proposition that failure to follow a progressive discipline policy does not establish that a termination was for "willful misconduct." However, the unemployment concept of "willful misconduct" is not the standard in workers' compensation, which goes by the lesser "lack of good faith" standard, which [Employer] was able to meet in this case. *See Virgo*[, 890 A.2d at 19] (holding that the stricter unemployment compensation willful misconduct standard is not the standard to determine lack of good faith in the context allocating fault in a workers' compensation case). Consequently, we must reject Claimant's argument based upon these cases.

RR at 23a-24a n.1.

Claimant may not collaterally attack the WCJ's determination of his bad faith precluding the award of workers' compensation benefits under the Act by injecting standards applicable to the award of unemployment compensation benefits under the Unemployment Compensation Law (Law).[5] Stated simply, Employer's purported failure to follow its progressive discipline policy does not affect the WCJ's

---

[5] Act of December 5, 1936, Second Ex. Sess., P.L. (1937) 2897, *as amended*, 43 P.S. §§751-918.10. Specifically, where an employer has a policy identifying conduct that will result in employee discipline, including discharge, the employer has defined these offenses as disqualifying "willful misconduct" for purposes of Section 402(e) of the Law, 43 P.S. §802(e). *Brady v. Unemployment Compensation Board of Review*, 544 A.2d 1085, 1086 (Pa. Cmwlth. 1988). An employee cannot be found to have committed disqualifying willful misconduct where the employer's policy did not warn that such behavior could result in a dismissal. *PMA Reinsurance Corporation v. Unemployment Compensation Board of Review*, 558 A.2d 623, 626 (Pa. Cmwlth. 1989). Additionally, where an employer's policy provides for progressive discipline, the employer has identified the process that the employer will follow in response to employees' misconduct. *Id.* at 625-26. Once an employer identifies the process that will lead to discharge, the employer's failure to follow the steps outlined in its progressive disciplinary policy will preclude a denial of unemployment compensation benefits due to willful misconduct. *Id.*

14

determination, supported by substantial competent evidence as outlined above, "that suitable work was available or would have been available but for circumstances which merit allocation of the consequences of the discharge to the claimant, such as claimant's lack of good faith." *Vista International Hotel*, 742 A.2d at 658.

Accordingly, the Board's order is affirmed.[6]


_____
MICHAEL H. WOJCIK, Judge

---

[6] It is well settled that this Court may affirm a Board order on any basis appearing in the record. *White v. Workmen's Compensation Appeal Board (Good Shepherd Rehab Hospital)*, 666 A.2d 1128, 1131 n.6 (Pa. Cmwlth. 1995).

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Franklin Montano,                          :
                                           :
                        Petitioner         :
                                           :
            v.                             :   No. 732 C.D. 2021
                                           :
Advance Stores Company, Inc.               :
t/a Advance Auto Parts                     :
(Workers' Compensation                     :
Appeal Board),                             :
                                           :
                        Respondent         :

# **O R D E R**

AND NOW, this 27th day of June, 2022, the order of the Workers' Compensation Appeal Board dated June 2, 2021, is AFFIRMED.

                                    _____
                                    MICHAEL H. WOJCIK, Judge